AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JEREMY BRENDAN SEARS | |
| | MAGISTRATE'S CASE NO.<br>14-0851M |

Complaint for violation of Title 18, United States Code, Section 2251(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE STEPHEN J. HILLMAN | FILED<br>CLERK U.S. DISTRICT COURT<br>APR 29 2014<br>UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>July 2013 & Nov. 8, 2013 | PLACE OF OFFENSE<br>Ventura County | ADDRESS OF ACCUSED (IF KNOWN)<br>4468 Autumnglen Court, Moorpark, California 93021 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. § 2251(a)]

In or around July 2013, in Ventura County, within the Central District of California, and elsewhere, JEREMY BRENDAN SEARS knowingly employed, used, persuaded, induced, enticed, and coerced a minor, specifically, a 14-year-old boy, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and for the purpose of transmitting a live visual depiction of such conduct, which visual depiction defendant SEARS knew and had reason to know would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

### [18 U.S.C. § 2251(a)]

On or about November 8, 2013, in Ventura County, within the Central District of California, and elsewhere, JEREMY BRENDAN SEARS knowingly employed, used, persuaded, induced, enticed, and coerced a minor, specifically, a 14-year-old boy, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and for the purpose of transmitting a live visual depiction of such conduct, which visual depiction defendant SEARS knew and had reason to know would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>DAVID B. HAND<br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>STEPHEN J. HILLMAN | DATE<br>April 29, 2014 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Joshua A. Klein x6527          REC: Detention

## AFFIDAVIT FOR SEARCH WARRANT AND ARREST WARRANT

I, David B. Hand, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed since May 1998.  I am a federal agent and empowered by United States law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code (U.S.C.).  During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, executed and participated in the execution of search and arrest warrants, and seized evidence of violations of United States law.  I currently am assigned to investigate the sexual exploitation of children and child pornography in the Central District of California, and am responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, U.S.C., Sections 2251 et seq.  In support of this assignment, I attended a three-day FBI Crimes Against Children Seminar in January 2012, a one-day Introduction to Internet Investigations online course in April 2012, and a one-week FBI "Innocent Images" (internet crimes against children) Online Basics Training in June 2012.  I also completed three two-day courses on conducting internet peer-to-peer investigations in February and July 2013, and I attended three hours of training on child forensic interviewing in October 2013.

2.      This affidavit is made in support of an application for a search warrant for 4468 Autumnglen Court, Moorpark, California 93021 (the "SUBJECT PREMISES," described in Attachment A, attached hereto and made a part hereof), for fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), and in support of an application for an arrest warrant to arrest Jeremy Sears ("SEARS") for the same crimes.

3.      In addition to the facts otherwise stated in this affidavit, this application and affidavit incorporates the affidavits in support of two related search warrants that were

[Instrumentality Protocol]

previously granted in this district: (A) the affidavit in Case No. 13-01540-M, which is attached hereto as <u>Exhibit A</u> (concerning a 2013 warrant under 18 U.S.C. § 2703(d) to search and seize the contents of multiple Facebook.com accounts); and (B) the affidavit in Case No. 13-02223-M, which is attached hereto as <u>Exhibit B</u> (concerning a 2013 warrant to search and seize materials from the same premises as this warrant).  Those prior applications and warrants are incorporated herein as if fully set forth.  While they are summarized in part in this new affidavit's exposition of probable cause, the Court is respectfully referred to the prior affidavits for a fuller exposition.

4.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.[1]

## II.   PREMISES TO BE SEARCHED

5.      The premises to be searched (the SUBJECT PREMISES), further described in Attachment A (attached hereto and incorporated herein) is the property located at 4468 Autumnglen Court, in the city of Moorpark, California 93021, in Ventura County.  (The street sign lists the street as North Autumnglen Court, but mapping software and the target's DMV records list it simply as Autumnglen Court.)  The SUBJECT PREMISES are further identified as the residence of Jeremy Brendan SEARS ("SEARS"), and are further described as a residential lot improved by a free-standing two-story dwelling house featuring a gray flat tile roof, a light gray wood siding exterior with white fascia trim, and a natural colored oak front door covered with a blue colored wood screen door.  The numbers "4468," black in color on white tile, are attached to the wood siding exterior, facing west, on the north side of the two-car garage on the

---

[1] In this Affidavit, initials will be used to reference the names of minors -- whether victims or suspected perpetrators -- as well as the names of certain adults (such as apparent parents and other relatives) from whom the minors' names could be derived.

west corner of the house. The numbers "4468" are also painted on the curb in front of the property.

## III. SUMMARY

6.     The FBI's investigation has revealed that Jeremy Brendan SEARS, an adult male (approximately 23 years old) domiciled at the SUBJECT PREMISES in Moorpark, California, in the Central District of California, acting at times with one or more coconspirators and/or accomplices, has (1) tricked, threatened, harassed, and extorted minors into producing sexually explicit, lascivious, and naked photographs of themselves and sending those photographs to SEARS, who then (2) possessed and further distributed certain of those photographs further. SEARS' primary method of accomplishing these goals was to use false identities in order to meet and befriend the minor victims through Facebook.com, Meetme.com, and other Internet social networking sites. By various means, SEARS would then trick, harass, and extort the minors into producing and sending the exploitative photos -- sometimes by threatening harm to the minors themselves, to their families, or to people whose false identities SEARS or his coconspirators had created. SEARS stored and distributed the exploitative photographs -- including by gaining control of one victim's Facebook account to post the exploitative photographs there, where they could be seen by the victim's friends and acquaintances.

7.     SEARS targeted some of his victims as an extension of his activities in The Confederacy -- an online social group which appears to have focused on harassing and bullying victims by means of "trolling" and "hijacking." "Trolling" is internet slang for the activity of posting inflammatory messages in an online forum, chat room, or blog, with the intent of provoking an emotional response from the members. "Hijacking" means to gain administrative control over someone else's social network account. SEARS and other Confederacy members primarily targeted fans of the singer Justin Bieber and the singing group One Direction -- fans known as "Beliebers" and "Directioners." SEARS and other Confederacy group members used "alts" (alternative identities or aliases) and "soxpuppets" (fictitious accounts) to disguise their identity.

8.     On August 15, 2013, the Ventura County Sherriff's Department ("VCSD") arrested SEARS, leading to a now-pending criminal case (Ventura County Superior Court Case No. 2013025544) charging SEARS with four counts of felony luring, in violation of Cal. Penal Code § 288.4(b), one count of felony extortion, in violation of Cal. Penal Code § 518, and one count of felony possession or control of child pornography, in violation of Cal. Penal Code § 311.11(a). Those charges relate to incidents, on June 1, 2013, and August 15, 2013, in which SEARS posed online as a teenage female in order to trick a minor-aged male into sending naked photos of himself, and in order to trick the minor male into meeting SEARS under the belief that they were going to meet the purported female for sexual activity.

9.     When SEARS was interviewed by the VCSD and myself on August 15, 2013, he admitted the specific conduct underlying the Ventura County Superior Court case -- i.e., that he had posed as a female online in order to convince the minor male into sending SEARS obscene photographs of himself and to meet with him in a park at night. SEARS further admitted that, in addition to that conduct, he had also solicited and threatened specific additional people whom he knew were minors into taking pictures of themselves naked and masturbating, and into sending SEARS the pictures. SEARS further admitted that he had subsequently redistributed some of those pictures by posting them to various Internet websites where they could be publicly viewed. He stated that these activities were all taken because he had become "demented" and wanted to exert control over his minor victims by making them do what he wanted.

10.     On August 15, 2013, the FBI executed the federal search warrant in Case No. 13-02223-M (attached hereto as Exhibit B) to search SEARS' home (i.e., the SUBJECT PREMISES) and computer devices for evidence of federal child-pornography crimes. The FBI seized and searched computer devices and storage media identified as belonging to and used by Jeremy SEARS, but did not at that time seize or search devices that SEARS' mother identified as belonging to or used by other family members in SEARS' house. My search of the computer devices that were seized on August 15, 2013, revealed conclusive evidence corroborating SEARS' confession that he had engaged in soliciting multiple minors to produce child

4

pornography and send the photos and videos to him. In one case, after I identified a minor victim (N.L.) by name and photo while searching SEARS' devices, I subsequently located the same photos (including a close-up of a vagina) as publicly accessible files on two Internet websites, thus confirming that SEARS had distributed that minor's obscene photos. The public internet posting of N.L.'s obscene photos also listed her name, telephone number, school, and online accounts.[2]

11.     Since the time of his August 2013 VCSD arrest, SEARS has been on release in his Superior Court case. One of the conditions of his release is that he is prohibited from contacting minors and is not allowed to access the Internet. In addition, the FBI, in August 2013, seized the computers at SEARS' home that we then believed he was using. However, a victim-interview that I and the VCSD conducted on April 24, 2014, with 14-year-old victim L.Z., made clear that, since the time of the August 2013 arrest in his state-court case, SEARS has used one or more other Internet-connected digital devices in his house to (1) recontact at least one of his minor victims, and (2) convince that minor victim, L.Z., to take more naked photographs of himself and send them to SEARS. As a result, today I am seeking a search-warrant to search for and seize other digital devices at SEARS' home, and I am seeking a federal arrest warrant to arrest SEARS for the production and receipt of child pornography relating to victim L.Z.

## IV.   BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND CHILD PORNOGRAPHY

12.     In this affidavit, child pornography, visual depiction, minor, and sexually explicit conduct are defined as set forth in Title 18, United States Code, Section 2256.

---

[2] N.L., who was 14 at the time of the photos, was interviewed. She admitted that the photos showed her face, but said that she had sent only clothed photos and that these must have been photoshopped. The interviewing agent deemed that response of N.L.'s likely to simply reflect her extreme embarrassment at the fact that her naked photos and contact information were being distributed on the Internet. SEARS has admitted to repeatedly posting various minors' obscene and naked photographs publicly. (Records from the websites where N.L.'s photos were found show that internet-proxies were used to make the postings, such that the original poster's IP address cannot be determined. In SEARS' interview, he admitted that his practice was sometimes to use proxies when he was posting minor victims' obscene photos on the Internet.)

13.     Based on my training and experience, and the experience of other law enforcement officers with whom I have communicated, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornographers can now produce both still and moving images directly from a common video camera, and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images with other Internet users worldwide.

14.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.

15.     The Internet is a collection of computers and computer networks that are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information.  Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

16.     Individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers (ISPs).  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISP's servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail

transaction information, posting information, account application information, and other information both in computer data and written record format.

17.     An Internet Protocol address (IP address) is a unique numeric address used by each computer on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination.  Most ISPs control a range of IP addresses.  When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP.  The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.  For ISPs using so-called "static" IP addresses, the customer is assigned a unique IP address not merely for a particular session, but for an extended period which could be the entire length of service.

18.     Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

19.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media; or from literature describing such activity.

20.     Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these

materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

21.    Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material – that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. – in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years.

22.    Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

23.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

24.    Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## V.   STATEMENT OF PROBABLE CAUSE

**A.   FBI INVESTIGATION INTO JEREMY SEARS' FACEBOOK ACTIVITIES TARGETING FEMALE MINORS BEFORE AUGUST 2013**

25.      In December 2012, the VCSD received three CyberTipline Reports, 1723671, 1723680, and 1723686, from the National Center for Missing and Exploited Children.  Internet service provider Facebook reported that "Tommy Wiseau," account 100002506960188, had uploaded two CEI (child exploitive image) videos of a 12-year-old female from IP address 99.105.107.189.  In the videos, the minor strips naked in front of a camera and uses her fingers to rub her outer labia and penetrate herself.  The 12-year-old victim's Facebook account 100003527417364 was taken over by someone who uploaded five CEI of the victim from IP address 99.105.107.189.  The victim's name corresponds to the initials J.L.H.

26.      Facebook reported that the login for the "Tommy Wiseau" account was on December 17, 2012 at 10:05 PST from IP address 99.105.107.189.  Facebook security personnel disclosed that that account was associated with Jeremy Brendan SEARS at 4468 Autumnglen Ct, Moorpark, California.  In response to an administrative subpoena served on SBC Internet Services / AT&T for the IP address/date/time, AT&T disclosed that that IP address (a unique static address assigned to a particular account) was assigned to William Sears at 4468 Autumnglen Ct, Moorpark, California.  According to records checks, William Sears, who is 54 years old, may reside with and is referenced as a relative of Jeremy SEARS.  The Ventura County CLETS Interface System lists Jeremy SEARS's date of birth as xx/xx/1991 and lists his address as 4468 Autumnglen Ct, Moorpark, California.[3]

27.      On January 14, 2012, the VCSD served a Ventura County Superior Court search warrant on Facebook Inc. for account content from November 1 to December 31, 2012 on several Facebook accounts associated with SEARS, including account 100002506960188.

---

[3] Throughout the remainder of this document, Jeremy SEARS will be referred to as the user associated with IP address 99.105.107.189 when that IP address was used to interact with Facebook.

28.     As part of an FBI investigation into SEARS' activities, I have reviewed the records that Facebook sent in response. My review revealed a number of conversations in which SEARS (consistent with SEARS' later admissions, as discussed below): (1) threatened an apparently minor victim (C.T.H.) that she would die if she did not show herself naked to him on a webcam; and (2) told another apparently minor victim (Y.) that she should "take everything off," then later chastised her for "performing sex acts on cam for 10 strangers." These records are further discussed at pages 15-18 of the Affidavit in support of the search warrant attached hereto as Exhibit A, which also describes (3) an elaborate scheme in which SEARS tricked 12-year-old J.L.H. into believing that a SEARS account had the ability to kill J.L.H.'s online boyfriend (who was, in fact, another account controlled by SEARS) and that the only way J.L.H. could save the boyfriend's life was by sending obscene photos of herself. SEARS elsewhere in these records stated that he knew J.L.H. was 12 years old. My review of additional Facebook records received through additional warrants has also revealed photos of J.L.H. naked and masturbating, and a nude photo of 16-year-old A.A. from Australia. Elsewhere in the account records, an account linked to SEARS posted that he was "having so much fun spamming OBD with the nudes of people I hate that I've saved for blackmail all these years."

**B.     SEARS' ONLINE-IMPERSONATION OF FEMALES, LEADING TO HIS AUGUST 2013 VCSD ARREST FOR LURING MINOR MALE VICTIMS AND HIS PENDING STATE-COURT CASE**

29.     In the early-morning hours of August 15, 2013, a 17-year-old male, M.N., made a report to the VCSD. (See Exhibit B, at ¶¶ 9-12).

a.     M.N. said that he had been messaging on the website MeetMe.com with a purported minor female named "Rachel." (SEARS subsequently admitted that he was controlling the fictitious "Rachel" account, as described below). "Rachel" sent M.N. a nude photo of a teenage girl, which she said was a picture of herself. "Rachel" told M.N. to send naked photos of himself to her, which M.N. did. M.N. and "Rachel" set up a 1 a.m., August 12, 2013, meeting at a public park in Moorpark, California. When M.N. arrived, SEARS was there instead of "Rachel." SEARS said "Rachel" was his sister, and that M.N. should get naked so

that SEARS could arrange the meeting with "Rachel." M.N. got naked as directed, following SEARS for two hours while SEARS was purportedly bringing him to "Rachel." "Rachel" never arrived, and SEARS kept M.N.'s clothes, forcing M.N. to return home naked except for a towel.

      b.    M.N. reported that he later got on the same website again, communicating with another purported female, "Sammi." M.N. agreed to meet to meet "Sammi" in the early morning hours of August 15, 2013, in the same general vicinity. Once again, M.N. arrived and found that, instead of the female, the person there was SEARS. SEARS once again enticed M.N. to remove his clothes. SEARS asked M.N. to turn around. M.N. kept his clothes closer to him this time, and asked SEARS for M.N.'s clothes and wallet from last time, which SEARS again refused to give him. M.N. left -- this time wearing his clothes. Later in the morning M.N. and SEARS communicated by text-messages, with M.N. still asking for his clothes and wallet back.

      c.    M.N. contacted authorities that day (August 15, 2013). M.N. and SEARS arranged to meet at in the vicinity of Arroyo Vista Park later that morning. Ventura County Sherriff's Deputies were present when SEARS showed up. M.N. positively identified SEARS as the male who had met with him earlier that morning and on August 12.

### C.    SEARS' ADMISSIONS ABOUT PRODUCING, RECEIVING, AND DISTRIBUTING CHILD PORNOGRAPHY

30.    VCSD deputies arrested SEARS on August 15, 2013. SEARS was advised of his Miranda rights and agreed to waive them, and he was interviewed by VCSD personnel and myself.

31.    With respect to the VCSD investigation into SEARS' luring of minor boys, SEARS admitted to sending a nude girl's image to M.N., and admitted to asking from M.N. and receiving from M.N. several nude photos of M.N. He admitted meeting M.N. both times at the park and telling M.N. to take off his clothes. He said he had uploaded several nude photos of M.N. on an Internet website ugotposted.com, but said he was not sure whether the website had made the photos available to others yet, because there is some sort of delay. He denied taking pictures of M.N. at the park while M.N. was nude, but he admitted asking to touch M.N.'s penis.

Although SEARS first claimed that M.N. was the only minor he had met up with in this sort of scheme, SEARS eventually admitted to similar conduct with another minor boy, J.B. -- i.e., SEARS admitted to posing as a female in order to lure the second victim to a park at night. SEARS also said that he had posted many pictures of J.B. for others to see online.

32.     With respect to the FBI's federal investigation into SEARS' use of Facebook and other internet websites to produce, receive, and distribute child pornography, SEARS admitted to wide-ranging violations of federal child pornography laws.  He said that his practice was to post a fake profile, wait for someone to take the bait, then go back and forth about trading photos.  He said that he "clearly" knew what he was doing: "trying to get underage people to send me naked photos of themselves."  He said that the number of people he had gotten nude images of over the years was "definitely" more than 10 but probably less than 100.  He said that "most" of them were underage, in the range of 13 to 17 years old, but usually closer to 17.  Indeed, he said that he usually assumed by default that the people he was targeting were underage.  He said that he targeted both boys and girls, but that he began focusing more on boys because they were easier to convince.  With girls, he said that his practice was usually to ask them to show their vaginas to him on their web-cameras.  He claimed that his activities had "a very minor sexual thing to it," but were more about getting "power" and "control" over his victims.  He stated that he had started The Confederacy group on Facebook.

a.     Regarding J.L.H., SEARS said that he thought she was 12 or 13 years old; he had set up a fake account -- Louis Tompkins -- to get the girl to fall for the fake person, believing he was her boyfriend.  SEARS said that he had told J.L.H. to send him nudes so that he would not hurt Louis.  SEARS said that once he had the photos, he posted them to a Facebook group so others in the group could see them.  He also said that, because he had gotten J.L.H. to tell him her Facebook login information, SEARS was also able to post the photos on her Facebook page.

b.     Regarding A.A., SEARS said that he did not remember if she was a minor, but he did remember that she lived in Australia.  He said that he got her to take one or two nude

photos, by threatening that if she did not send him the photos then he would travel to Australia and kill her. After SEARS had those photos, he threatened that if A.A. was not compliant with his later demands, then he would post her photos. Because she did not comply, he did post the photos on a publicly accessible website.

### D. ADDITIONAL FORENSIC EVIDENCE FOUND ON COMPUTER DEVICES SEIZED FROM SEARS' HOUSE IN AUGUST 2013 — INCLUDING EVIDENCE OF SEARS' SOLICITATION OF OBSCENE PHOTOS FROM 14-YEAR-OLD L.Z.

33. When executing the search warrant for SEARS' computer devices at his house on August 15, 2013, I was informed by SEARS' mother that SEARS used only the digital devices in his own room — not any devices in his parents' or brother's rooms. As a result, the search team executing the August 15 warrant seized only devices in SEARS' room for further examination.

34. During the months following August 15, 2013, I personally examined the tremendous volume of digital evidence seized from SEARS' room. SEARS' computer drives contained dozens of folders, organized by each likely victim's name, containing photos of likely underage victims. To date, about a dozen of those victims have been positively identified by name and location.

35. For instance, photographs and videos of victim L.Z. (whom I have interviewed and confirmed to be 14 years old) were found on one of Sears' hard drives, under folders named with L.Z.'s name. The folders contained about five videos of L.Z. In one of the videos, L.Z. simply dances around, fully clothed. In the other videos, L.Z. is in his underwear or naked, and at points he masturbates in front of the camera. The videos also feature screen-captures of instant-message conversations between L.Z. and his interlocutor (now determined to be SEARS). In one, SEARS tells L.Z. to adjust his equipment to make the pictures less blurry, and occasionally allows that L.Z. might be "allow[ed]" to take pictures instead of videos. SEARS then ordered specific photos, such as "2 full body pics, one from the front and one from the back," "close up of the dick and balls," and "close up of the ass." When L.Z. protested that he "never agreed to this," SEARS said to "go back to the webcam deal." When L.Z. said their deal

was only for him to "strip into underwear. That's it," SEARS responded that "I never said there wasn[']t more." The folders also contained several hundred photographs of L.Z. in various states of undress, including close-up photographs of L.Z.'s bare penis. (Some of the photos appeared to be still-shots of the videos).

      a.    L.Z. has been subsequently interviewed. In addition to discussing SEARS' post-August solicitation of additional child pornography (further discussed below), L.Z., in his interview, explained and provided documentation on the pre-August activities related to these videos and photos found on SEARS' computer. L.Z., who is 14 years old, said he was introduced to SEARS online by a mutual online acquaintance, who was a member of The Confederacy. (L.Z. says that he, too, became a member of a Confederacy-predecessor group, called Bieber Trolling and Hijacking Company.) When L.Z. and the mutual friend had a falling out, SEARS became upset. In revenge, SEARS obtained L.Z.'s phone number and posted it on the Internet in Craiglist advertisements and other places. As a result, L.Z. received a lot of telephone calls. SEARS also appeared to have learned the name of L.Z.'s girlfriend. L.Z. agreed to provide nude pictures to SEARS because he was worried that otherwise SEARS would blackmail and harass the girlfriend into providing nude pictures. L.Z. stated that SEARS directed him to dance on camera, to take various particular photos, and to masturbate on camera and show his ejaculate. L.Z. stated that he believes he provided about 80 photos to SEARS. L.Z. also stated that he heard from another person that his nude images had been posted on some Facebook page.

      b.    L.Z.'s recounting of the episode is corroborated by additional evidence. L.Z. provided law enforcement with access to his Facebook account, which allowed me to review an online conversation that L.Z. had with user "Hairstyles" on July 3, 2013. When L.Z. asked "Is this Jeremy Sears," Hairstyles responded "It is." (As a result, Hairstyles will henceforth be referred to as SEARS.) SEARS then said they should "work something out," and that his "original price was for you to just dance around on webcam." L.Z. asked SEARS to "never use his number again." SEARS agreed, and cautioned that he had been ready to have

people place international texts and calls to L.Z., and that that would have cost L.Z. a lot of money. Through L.Z.'s account, I was also able to review a saved online conversation that L.Z. had with another Facebook user (whom L.Z. identified as SEARS) on July 27. L.Z. said his girlfriend complained he shouldn't do "dangerous things to help her." SEARS asked whether the girlfriend wanted herself to be "harassed for a long time" or wanted to take nude pictures herself. In the same conversation, in a portion dated August 6, 2013, SEARS appears to have cut and pasted a conversation (or purported conversation) in which SEARS told others that L.Z. had "paid what he owed" so they should not attack L.Z.'s friend again. In other words, SEARS here was showing L.Z. a conversation purporting to show that L.Z.'s provision of nude pictures to SEARS was causing SEARS to protect L.Z.'s friend from the others in SEARS' group. Indeed, in the conversation, SEARS told L.Z. that "they're not allowed to go after you again without my permission, and they'll never get that again."

        c.    L.Z. also showed me copies of emails in L.Z.'s "Sent Mail" folder. Those included emails containing about 50 attached nude photographs. The photographs appeared to me to match photos that I had found in the L.Z. folders on the computers seized from SEARS' house. The emails with the photos were sent to two email addresses that L.Z. said SEARS had provided him. One of those addresses, barrymanilow78@yahoo.com, had been previously linked to SEARS in this investigation.

### E.    DISCOVERY OF SEARS' CONTINUING SOLICITATION OF CHILD PORNOGRAPHY FROM L.Z.

36.    The recent interview with L.Z. also made clear that SEARS did not stop soliciting the production of child pornography after his VCSD arrest in August 2013. To the contrary, months after SEARS' VCSD arrest and the FBI seizure of SEARS' computers, SEARS was using one or more other devices in his home to contact L.Z. and to convince L.Z. to send more nude photos.

37.    L.Z. has stated to me that on November 3, 2013, he was contacted on Facebook private messaging by a screen-name he did not recognize. L.Z. knew SEARS to use several

fictitious Facebook identities.  As previously stated, L.Z. has made his Facebook account available to law enforcement.  I have reviewed the records of several messaging sessions from that account.

        a.      The first is from November 3, 2013—a few months after the FBI executed its search warrant at SEARS' home, and during the pendency of SEARS' still-pending Ventura County Superior Court case.  In the chat, the other interlocutor identified himself by saying "its Jeremy," and communicated to L.Z. that "the fbi after me."  (As a result, I will now refer to the interlocutor as SEARS.)  SEARS stated that he had "been banned from phone and internet since august 16" and that the "fbi raided my house interrogat[e]d me and took my stuff."  SEARS said he was "still going, just smuggling my bros wii for wifi" and that it is "so hard to use facebook on an old wii i dont know what else i can do."[4]  SEARS wrote that the "fbis not tappingi just made this account to message you...plus they know ive had no internet so they don't know I have it now I've been extremely cautious."  SEARS said that he has been "plotting to escape but theres no opening."  SEARS asked L.Z. if there was "any way you can come to moorpark.  i can't leave the house but people can come to me."  SEARS said L.Z. should "come down here before january? just let me ride with you and ill be free."  SEARS said "i cant escape by myself but with a getaway car i can make it."  (L.Z. responded that "a 14 year old kid isn't your best option.")  SEARS repeated that "I would seriously do anything for you if I get out," and that "all that will be known is that i escaped. nothing more."  SEARS said "i'm desperate and i have nothing left to lose."  At times, SEARS appeared to lapse back into threats: "being as nice as anyone can possibly be doesnt move you. you wont save me to save yourself or [another person]. i can get your nudes spread everywhere  but would you even care enough to stop that?"[5]

---

[4] Based on my training and experience, I conclude that SEARS was claiming that he was using his brother's Nintendo Wii gaming device to access Facebook.com.  See http://www.nintendo.com/wii/built-in-entertainment/;jsessionid=CD2C3B85B943080 CA6C91070AECBD370#/internetchannel (describing the use of the Wii gaming console to "browse the Internet with ease").

[5] SEARS misinformed L.Z. that he was going to be sentenced on January 7—an impossibility since SEARS' trial in his state case had yet to be scheduled.

b.      On November 6, 2013, SEARS continued the private messaging session with L.Z.  Saying that he had become "calmer" and willing to "accept" L.Z.'s decision not to rescue him, SEARS asked for "one favor that would ease my pain before i die in a couple months."  Complaining that "every file I ever had and . . . computers and cell phones" had been taken by the FBI, SEARS asked "could i have some pics? just for myself"—and specified "nudes" of named girls "to look at and admire one last time."[6]  SEARS asked "do you have nudes of anybody i know that i havent gotten yet?" L.Z. replied "Nope."  SEARS responded "can you take more then?"  L.Z. queried "of myself?" and SEARS replied "yes."  L.Z. asked "how many pictures" to which SEARS answered "30."  SEARS asked "when can you take them" and L.Z. replied "Friday probably."  SEARS also said, however, that "30 is really low," and that "its been nearly 3 months of nothing so im pretty thirsty."  SEARS therefore asked for "50" pictures each month until January -- that is "100 total."  SEARS asked L.Z. to "take a few tonight"—"just the standard full body pics, nothing exotic.  10's good."  SEARS told L.Z. to send the photos to mrbigispleased911@gmail.com.

c.      On November 7, 2013 in another private messaging session, SEARS directed L.Z. to "send them the same day you take them, please.  if you take 10 tonight just send 10.  dont drag it out.  like i said last night, first 10 is just usual full body.  nothing fancy.  front, back, sides, up, down thank you.  ill be looking up stuff and checking facebook regularly.  no tabs or other windows on this wii."  SEARS told L.Z. "Closing this account.  will add you on a new one im making.  as usual, tell nobody about my existence."

d.      On November 8, 2013, in another private messaging session, SEARS asked "is it happening tonight?  pls respond."  L.Z. replied "They should be sending" to which SEARS responded "I got them, thank you."

---

[6] Portions of the conversation imply that L.Z. has his own child-pornography images of an ex-girlfriend's naked body, and that he sometimes obtains other child-pornography images from the web.  It should be noted, however, that L.Z. is himself 14, making it less remarkable that he might have or seek naked images of another teenager.  Elsewhere, L.Z. shows his concern that he does not want to get into trouble for activities he may have himself engaged in — presumably as a member of the Bieber Trolling and Hijacking group.

e.     In another messaging session, during November 13-16, SEARS asked L.Z. to "Try to take some [pictures] tonight." SEARS then told L.Z. that if he didn't want to take the pictures then he didn't have to. However, L.Z. said he would take them when he found the time. SEARS replied "thank you." On November 20, SEARS asked if L.Z. would be able to "take 40 in the next 10 days." SEARS also asked if "i will get get 50 total by the end of november? already got 10." SEARS then said that if you want or need to talk, send an email. im deactivating facebook and not making another. just email the pics when theyre ready, and just chat whenever. mrbigispleased911@gmail.com or barrymanilow78@yahoo.com."

38.     During the interview, L.Z. showed me an email message he sent to mrbigispleased911@gmail.com on Friday, November 8, 2013. Attached to this email were nine images of L.Z. nude, including one of full-frontal standing nude, two full-back standing nude, two standing sideways nude, one photo taken from the floor, with the camera pointed up at L.Z.'s genitalia, and one of L.Z. standing with the camera pointing down towards his feet.

39.     Evidence shows SEARS has been in further contact with L.Z. as recently as this month. L.Z. told me that on April 16, 2014, he was contacted on Facebook private messaging by screen-name "Charles Kane," which he did not recognize. "Charles Kane" wrote "I'll be in this waiting game for a long time. If there's anything to discuss, you can message me here. I can't get in the Mr. Big Gmail, so don't send stuff there." L.Z. believes that this person was SEARS, based on the content of the statement. I, too, would note that the reference to the "Mr. Big Gmail" confirms this person's identity as SEARS.

40.     All of SEARS' contacts with L.Z. are in violation of the release conditions in his Ventura County Superior Court case. VCSD Detective Guy Fadler, who is investigating SEARS' state-court case, has sent me a printout page from SEARS' Ventura County court case docket. The entry for August 22, 2013, shows that "Defendant on conditional released O.R. Further conditions are as follows: Not to communicate with any known minor and no access to the internet." The communications referenced above show that SEARS violated both of these conditions, in that he has had repeated contact with L.Z. despite knowing L.Z. was 14, and he

had these contacts via the Internet. This all occurred despite the FBI's prior seizure of SEARS' own devices from SEARS' home. As a result, I believe SEARS is using other equipment in his home to contact L.Z.

41.    Although the only computer equipment that I am aware of SEARS referencing in his post-August conversations with L.Z. is SEARS' brother's Wii, I do not believe that that is necessarily the only computer device he has been using to connect to the Internet and contact victims. First, from a conversation with SEARS' mother at the time of the original search warrant, and from my own observations during the search, I know that there are other computing devices in the house. Second, SEARS has shown himself to be gravely dishonest when he communicates with his underaged victims—just because he says he is using a particular device does not mean that he is telling the truth. Third, even if he was using the Wii in November, it is possible that he has switched to another device for the more recent contact this month—for instance, his recent reference to the "Mr Big Gmail" being inaccessible now may mean that his family discovered his earlier Internet use of the Wii and he has had to change his methods. Fourth, it is only by happenstance that we happened this month to be interviewing L.Z.; it is quite possible that SEARS is also continuing to contact (and solicit child pornography from) some of the dozens of additional apparently underage victims whom we have not been able to positively identify, and he could be using any of the digital devices in his home to do so. SEARS' mother, at the time of the August warrant, had indicated that SEARS did not use the other digital devices in the home. Even if that were true (and her ignorance about SEARS' other illegal activities means she knows less than she thinks about his computer usage), the situation would have changed since August: because SEARS no longer has his own devices, he must use other digital devices in the home to engage in his compulsive child-pornography seeking behavior. In fact, SEARS' communications with L.Z. indicate that he was hiding his continued use of Internet-connected devices from his family (as evidenced by his reference about "smuggling my bros wii"_ and that he was frustrated with the limited functionality of the Wii gaming system as an Internet browser (because it was hard to use and had "no tabs"). In short,

there is now probable cause to seize all digital devices in the home, so that they can be examined for evidence of the child pornography activities that SEARS engaged in before the August search warrant and continued to engage in afterwards.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

42.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; gaming systems; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or

viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary

22

to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

43.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>ITEMS TO BE SEIZED</u>

44.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the items to be seized, listed in Attachment B, constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography).

## VIII.   CONCLUSION

45.     For the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.  There is also probable cause for the arrest of Jeremy SEARS, for violating the same statutes, through his enticing L.Z. to produce child pornography, through his receipt of child pornography from L.Z., and from his distribution of some of the child pornography he received from L.Z.


_____
DAVID B. HAND, Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before me
this 29th day of April, 2014.


_____
HONORABLE STEPHEN J. HILLMAN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

AO 93  (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with certain listed accounts that is<br>stored at premises controlled by Facebook Inc. | )<br>)<br>)  Case No.<br>)<br>)<br>) |

## M 13 01540

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the        Northern       District of           California
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before        14 days from the date of its issuance
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
on duty at the time of the return through a filing with the Clerk's Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____

Date and time issued:        6/6/13 _____        _____
Judge's signature

City and state:    Los Angeles, California     11:10 ____        Hon. Stephen J. Hillman, U.S. Magistrate Judge
Printed name and title

AUSA: Joshua A. Klein

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| *Return* | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant ~~and inventory~~ left with: |

*Inventory made in the presence of :*

*Inventory of the property taken and name of any person(s) seized:*
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

*Certification* (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: _____          _____

                                                                    *Executing officer's signature*

                                                        _____

                                                                    *Printed name and title*

## ATTACHMENT B

### ITEMS TO BE SEIZED

I. **SEARCH PROCEDURE**

1. The search warrant will be presented to personnel of Facebook, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2. To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3. The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the agent who serves the search warrant.

4. With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant. The search shall extract and seize only the specific items to be seized under this warrant (see Section III below). In conducting this search, the

search team shall take notes regarding how it conducts the
search.

5.   If the search team encounters immediately apparent
contraband or other evidence of a crime outside the scope of the
items to be seized, the team shall immediately discontinue its
search pending further order of the Court and shall make and
retain notes detailing how the contraband or other evidence of a
crime was encountered, including how it was immediately apparent
contraband or evidence of a crime.

6.   The search team will complete its search of the
content records as soon as is practicable but not to exceed 60
days from the date of receipt from the PROVIDER of the response
to this warrant.  If additional time is needed, the government
may seek an extension of this time period from the Court within
the original 60-day period.

7.   Once the search team has completed its review of the
content records and created copies of the items seized pursuant
to the warrant, the original production from the PROVIDER will
be sealed -- and preserved by the search team for authenticity
and chain of custody purposes -- until further order of the
Court.

8.   The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the accounts identified as (1) The Confederacy (250114361763215); (2) Confederate Recruits (123346427808152); (3) Confederacy: MY EYES! THE GOGGLES DO NOTHING! (341813689243547); (4) Confederacy NSFW: Porn, Gore, etc. (376007025786404); (5) Confederacy Archives (254730454633372); (6) Reconstruction (101979619967010); (7) Kai's secret stash (502805716425633); (8) Speakeasy (536684223025730); and (9) Louis Tomkins (100004437309136) (collectively, the "SUBJECT ACCOUNTS"), that is stored at premises controlled by Facebook, Inc., a company that is located at 1601 South California Avenue, Palo Alto, California, 94304.

1

to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, including but not limited to:

i.   All e-mails and messages associated with the SUBJECT ACCOUNT, including stored or preserved copies of e-mails and messages sent to and from the account, draft e-mails and messages, and deleted e-mails and messages, as well as all header information associated with each e-mail and messages.

ii.   All records or other information stored at any time by subscribers of the SUBJECT ACCOUNT, including address books, contact- friend- and buddy-lists, calendar data,

pictures, notes, files, and groups that the SUBJECT ACCOUNT belongs to.

iii. All photographs and chat logs stored at any time by subscribers or users of the SUBJECT ACCOUNT.

iv. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a, including but not limited to all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

c. All subscriber information pertaining to the SUBJECT ACCOUNT, including but not limited to the date on which the account was created, the length of service, types of service utilized, account status, account settings, the IP address used to register the account, login IP addresses associated with session dates and times, the subscriber's full names, screen names, other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, as well as means and source of payment, including detailed billing records.

d.    Any printouts or copies that the PROVIDER had earlier made from its storage of all of the items and data types described above in subparagraphs 10(a)-(c), to the extent that the information in those printouts or copies is not otherwise being completely provided in other form under this warrant.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.    For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.    All information described above in Section II.10 that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251(a) (production/transmission of child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875 (interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371 -- those violations involving Brendan SEARS or M.N.P., or other members of The Confederacy, and occurring between November 1, 2012 and December 18, 2012, namely:

     i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts;

     ii.  Any and all communications with J.L.H., G.A.G, Y., and J.K.;

     iii. Any and all photographs or videos constituting child pornography; and

    b.   All records and information described above in Sections II.10.b and II.10.c.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

       Special Agent David B. Hand
       Federal Bureau of Investigation
       2075 South Victory Avenue
       Ventura, California 93003
       Tel: (310)420-5384
       Fax: (805)677-7368
       Email: David.Hand@ic.fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.  IT IS FURTHER ORDERED that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

## AFFIDAVIT

I, David B. Hand, being duly sworn, do hereby declare and state:

### I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed since May 1998. I am a federal agent and empowered by United States law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code (U.S.C.). During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, executed and participated in the execution of search and arrest warrants, and seized evidence of violations of United States law. I currently am assigned to investigate the sexual exploitation of children and child pornography in the Central District of California, and am responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, U.S.C., Sections 2251 et seq. In support of this assignment, I attended a three-day FBI Crimes Against Children Seminar in January 2012, a one-day Introduction to Internet Investigations online course on April 2012, and a one-week FBI "Innocent Images" (internet crimes against children) Online Basics Training in June 2012. I also completed a two-day Internet Crimes Against Children peer-to-peer training course in February 2013.

2.    I make this affidavit in support of an application for a search warrant for information associated with the user-accounts identified as (1) The Confederacy (250114361763215); (2) Confederate Recruits (123346427808152); (3) Confederacy: MY EYES! THE GOGGLES DO NOTHING! (341813689243547); (4) Confederacy NSFW: Porn, Gore, etc. (376007025786404); (5) Confederacy Archives (254730454633372); (6) Reconstruction (101979619967010); (7) Kai's Secret Stash (502805716425633); (8) Speakeasy (536684223025730); and (9) Louis Tomkins (100004437309136) (collectively, the "SUBJECT ACCOUNTS"), that is stored at premises controlled by Facebook, Inc., a provider of electronic communication, remote computing, and social-networking services (the "PROVIDER"), which is located at 1601 South California Avenue, Palo Alto, California, 94304.[1]

_____

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

3.    The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require the PROVIDER to disclose to the government copies of the information (including the content of communications and subscriber information) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

4.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS and the associated accounts constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 2251(a) (producing/ enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875

3

(interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371.

5.    The facts set forth in this affidavit are based upon my personal observations, my review of records and reports, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.    SUMMARY OF INVESTIGATION

6.    The FBI's investigation has revealed that Jeremy Brendan SEARS, an adult male domiciled in Moorpark, California, in the Central District of California, together with several coconspirators, has (1) tricked, threatened, harassed, and extorted minors into producing sexually explicit, lascivious, and naked photographs of themselves and into sending those photographs to conspirators, who then (2) possessed and distributed the photographs further.  SEARS and his coconspirators' primary method of accomplishing these goals was to use false identities or pose as celebrities in order to meet and befriend the minor victims through Facebook or other social

networking sites. By various means, the conspirators would then trick, harass, and extort the minors into producing and sending the exploitative photos -- sometimes by threatening harm to the minors themselves or to the people whose false identities the conspirators had assumed. The conspirators stored and distributed the exploitative photographs -- including by gaining control of one victim's Facebook accounts to post the exploitative photographs there, where they could be seen by the victim's friends and acquaintances.

7.    SEARS and his coconspirators did this as members of The Confederacy -- an online social group which appears to have focused on harassing and bullying victims by means of "trolling" and "hijacking." "Trolling" is internet slang for the activity of posting inflammatory messages in an online forum, chat room, or blog, with the intent of provoking an emotional response from the members. "Hijacking" means to gain administrative control over someone else's social network account. The Confederacy primarily targeted fans of the singer Justin Bieber and the singing group One Direction -- fans known as "Beliebers" and "Directioners." Confederacy group members use "alts" (alternatives or alias) and "soxpuppets" to disguise their identity. "Soxpuppets" are fictitious accounts created by Confederacy members to engage and befriend potential victims. Among the members of the Confederacy are SEARS (an adult male

Californian), and M.N.P.,[2] a 12-year-old female living in Denver, Pennsylvania.

8.     In December 2012, SEARS requested and received at least one child-pornographic image (as well as several additional nude images) via the internet from J.L.H., a minor female living in the New Philadelphia, Ohio, area.  At the time of the transmissions, J.L.H. was 12 years old and SEARS was 21 years old.  SEARS and M.N.P. shared J.L.H.'s nude images with other members of The Confederacy.  SEARS also gained control of J.L.H.'s Facebook account and posted her nude images there.  SEARS and other members of The Confederacy were also in contact with other minor females, and requested and possibly received nude images from them as well.

9.     Based on the investigation, I believe there is probable cause to believe that the SUBJECT ACCOUNTS will contain evidence of criminal activity in violation of 18 U.S.C. § 2251(a) (production/transmission of child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child

---

[2] In this Affidavit, initials will be used to reference the names of minors -- whether victims or suspected perpetrators -- as well as the names of certain adults (such as apparent parents and other relatives) from whom the minors' names could be derived.

pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875 (interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371.

## III.  TECHNICAL BACKGROUND ABOUT FACEBOOK

10.  Facebook Inc. is located at 1601 South California Avenue, Palo Alto, California, 94304.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Customers of Facebook Inc. can obtain a free user account by registering on Facebook's website and by providing biographical information, including the subscriber's name, address, gender and other information.  Facebook typically does not verify the information that the user so provides.  As a result, it is possible to establish accounts under false names (and displaying false user-photos and false biographical details), and to use those accounts to communicate with others under the false identity.

11.  Facebook users may join groups or networks to connect and interact with other users who are members of the same groups or networks.  A Facebook user can also connect directly with another individual Facebook user by sending the other user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends"

for purposes of Facebook and can exchange communications or view information about each other.

12.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, only to particular Facebook users, to all Facebook users, or to anyone with access to the Internet.  A particular user's profile page also includes a "Wall," which is a display-space where the user and his or her "Friends" can post messages, photos, attachments, and links that will typically be visible to anyone who can view the user's profile.

13.   Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's Facebook "Inbox," which also stores copies of messages sent by the recipient as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or their own profiles; such comments are typically associated with a specific posting or item on the profile.

14.   Facebook retains Internet Protocol "IP" logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the

date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.  Likewise, if a user uploaded a photograph or made comments, then the user's IP log would reflect that fact and the IP addresses used.

15.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number, if such number was used).  User account information may also include additional email addresses that the user provides for Facebook-related communications.  In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the providers or user as a result of the communications.  Such information may constitute evidence of the crimes under

investigation because the information can be used to identify the users of the SUBJECT ACCOUNTS.

16. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

## IV. STATEMENT OF PROBABLE CAUSE

17. In December 2012, the Ventura County Sheriff's Office (VCSO) received three CyberTipline Reports, 1723671, 1723680, and 1723686, from the National Center for Missing and Exploited Children. Internet service provider Facebook reported that "Tommy Wiseau," account 100002506960188, had uploaded two CEI (child exploitive image) videos of a 12-year-old female from IP address 99.105.107.189. In the videos, the minor strips naked in front of a camera and uses her fingers to rub her outer labia and penetrate herself. The videos were posted by "Meenah Trixies," account 100001264261680, to the Facebook group entitled "Confederacy NSFW: Porn, Gore, etc.," account 376007025786404, from IP address 24.152.223.168. (Based on my research and on communications with others who investigate child exploitation, I know that the acronym "NSFW" is commonly used in Internet communications as shorthand for "Not Safe For Work" -- meaning pornographic or risqué items that could cause problems

for the viewer if viewed at work.)  The 12 year old victim's account 100003527417364 was hacked, and the hacker uploaded five CEI of the victim from IP address 99.105.107.189.  The victim's name corresponds to the initials J.L.H.

18.  Facebook reported that the login for the "Trixies" Facebook account ending in -1680 on December 16, 2012 at 15:59 Pacific Standard Time (PST) from Internet IP address 24.152.223.168.  Additional research on that account and IP address established the following:

a.    Facebook security personnel provided information that account 100001264261680 uses the virtual handle "Meenah Trixies," and is associated with a name corresponding to initials M.N.P. at a particular address in Denver, Pennsylvania. M.N.P. is also associated with the virtual handle "Vriska Serket."

b.    An administrative subpoena was served on PenTeleData for the IP address/date/time.  Returns reported that this IP address was assigned at that date/time to a name corresponding to the initials Nichole ROSS, at the same address in Denver, Pennsylvania as that for M.N.P. above.  Public open source records checks indicate Nichole ROSS also uses the name Nichole P.  (The last name of Nichole P. is the same as the last name of the minor M.N.P.)  Nichole ROSS is 32 years old.  (Based

11

on my familiarity with the case, I am of the belief that Nichole Ross / Nichole P. is the mother of M.N.P.)

19.   Facebook reported that the login for the "Wiseau" account ending in -0188 was on December 17, 2012 at 10:05 PST from IP address 99.105.107.189.  Additional research on the IP address and account established the following:

a.   Facebook security personnel provided information that the Facebook account 100002506960188 uses the virtual handle "Tommy Wiseau," and is associated with Jeremy Brendan SEARS at 4468 Autumnglen Ct, Moorpark, California.  Additional Facebook accounts associated with SEARS include 1071399918, 100004887818228 and 100004697555297, and the virtual handle "Iwillrecordeverything."

b.   An administrative subpoena was served on SBC Internet Services / AT&T for the IP address/date/time.  Unlike typical Internet Service Providers, AT&T Internet Services U-Verse LightSpeed internet access users are assigned a unique IP provisioned to their accounts.  This IP address was assigned to William Sears at 4468 Autumnglen Ct, Moorpark, California.  According to records checks, William Sears, who is 54 years old, may reside with and is referenced as a relative of Jeremy B. SEARS.  The Ventura County CLETS Interface System lists Jeremy SEARS's date of birth as 01/25/1991 and lists his address as 4468 Autumnglen Ct, Moorpark, California.  Throughout the

remainder of this document, Jeremy SEARS will be referred to as the user associated with IP address 99.105.107.189 when that IP address was used to interact with Facebook.

20.   Facebook reported that the "Wiseau" and "Trixies" accounts were active in a series of private Facebook groups associated with members who call themselves "The Confederacy." The Trixies account -1680 uploaded nude images of J.L.H. to both "The Confederacy" (250114361763215) and "Confederacy NSFW: Porn, Gore, etc." (376007025786404).   Facebook further reported that individual accounts associated with members of The Confederacy were also linked to the Facebook group accounts "Confederacy: MY EYES! THE GOGGLES DO NOTHING!" (341813689243547) and "Confederacy Recruits" (123346427808152).

21.   On January 14, 2012, the VCSO served a Ventura County Superior Court search warrant on Facebook Inc. for account content from November 1 to December 31, 2012 on the following Facebook accounts (primary users): (a) 1071399918 (Jeremy SEARS); (b) 100004887818228 (Jeremy SEARS); (c) 100004697555297 (Jeremy SEARS); (d) 100002506960188 (Tommy WISEAU); (e) 100001264261680 (Meenah TRIXIES); and (f) 100003527417364 (J.L.H.)

22.   I have reviewed approximately 40,000 pages included in the search warrant returns from those six Facebook accounts -- four accounts associated with Jeremy SEARS, one associated with

13

M.N.P., and one assigned to victim J.L.H.  The VCSO requested
content from November 1 to December 31, but Facebook disabled
all but the account assigned to victim J.L.H. on December 17,
2012.  As a result, my review of the accounts corresponding to
Confederacy members SEARS and M.N.P. included only information
from November 1 through December 17.

23.  Based on my review, I estimate that The Confederacy
has been active for approximately one year and has approximately
10 members.  Within the above-referenced returns from Facebook,
statements or records were found indicating that the "Wiseau" (-
0188), SEARS (-5297), SEARS (-8228), and "Trixies" (-1680)
accounts have, collectively, posted images on the following
group accounts: (1) The Confederacy (250114361763215); (2)
Confederacy: MY EYES! THE GOGGLES DO NOTHING! (341813689243547);
(3) Confederacy NSFW: Porn, Gore, etc. (376007025786404); (4)
Reconstruction (101979619967010); and (5) Kai's secret stash
(502805716425633).  My review of the totality of the Facebook
returns indicates that the Confederacy attempted to obtain nude
images of fans of Justin Bieber and One Direction.  Fans of
these singers are typically minor and female.

24.  My review of the returns provided by Facebook revealed
the following information:

a.  "Meenah Trixies" (account -1680), "Tommy Wiseau"
(account -0188), and Jeremy SEARS (accounts -5297 and -8228) are

14

members of the eight Facebook groups or Louis Tomkins individual

account affiliated with The Confederacy as follows:

| | SEARS (-8228) | SEARS (5297) | Tommy Wisseau (0188) | Meenah Trixies (-1680) |
|---|---|---|---|---|
| The Confederacy | X | X | X | X |
| Confederacy Archives | | X | | |
| Confederacy NSFW: Porn, Gore, etc | | | X | X |
| Confederacy: MY EYES! THE GOGGLES DO NOTHING! | | | X | X |
| Confederate Recruits | | X | X | X |
| Reconstruction | X | X | | |
| Kai's Secret Stash | | X | X | |
| Speakeasy | X | X | | |
| Louis Tompkins | | X | X | |

b.    On November 24, 2012, several screenshots were

uploaded from SEARS's residence to SEARS' account ending in -

5297.  The image shows a conversation in which "Alex Campbell"

told a victim whose account name corresponds to the initials

C.T.H. (100002114218388), that she will die if she doesn't get

naked on webcam.  In the screenshot, C.T.H. appears to be a

minor.  One of the screen shots is titled "Fun fact:  [C.] has

stalked our pages and bitched at me from the exact day I found

Bieber or Die.  She also had a long-running crush on Alex, my

sockpuppet."  Another is titled "Staged the murder of my

sockpuppet.  Pretended to hack his account.  Had some fun."  On

December 16, 2012, "Wiseau" on account -0188 tells C.T.H. to

send her nudes to him.

c.    On November 24, 2012, two screenshots were

uploaded from SEARS's residence to SEARS's account -5297.  The

image shows a video chat with a female who appears to be a teenager.  The title of the screenshot image is "Torturing Y…"  In the video chat, Y. was told to "take everything off."  That same day, a screenshot of a conversation was uploaded from SEARS's residence to SEARS's account -5297 where a female with the first name the same as "Y" states "im not a whore and I know its true."  The other party responds "It obviously is true, you performed sex acts in exchange for payment…please explain how performing sex acts on cam for 10 strangers and agreeing in advance to be paid for it isn't being a whore."

       d.   On November 24, 2012, a screenshot was uploaded from SEARS's residence to "Wiseau's" account -0188.  The screenshot portrays a conversation in which an apparent minor female agrees to take photos of herself for someone named "Justin Bieber."  In the comments to that screenshot, someone (whom I believe to be a member of The Confederacy) told "Wiseau" "She's freely showing her boobs to someone on the internet."  "Wiseau" responded "She thinks it's really Beiber."

       e.   On December 4, 2012, "Wiseau" on account -0188 posted a message that "I'm having so much fun spamming OBD with the nudes of people I hate that I've saved for blackmail all these years."  Wiseau posts "helps that I've posted a fucton[3]

_____

[3] This term appears to be short for "a fucking ton".

of BHTC era nudes." (Based on my review of the totality of the search warrant returns and open source internet information, I believe that the Confederacy is a spin-off group of a group calling itself BHTC - the Bieber Hijacking and Trolling Crew.)

f. On December 6, 2012, multiple apparent members of The Confederacy collectively targeted G.A.G., and also made references about their interactions with G.A.G.'s friend J.L.H.

i. In an online chat captured on the "Wiseau" account -0188 (which is controlled by SEARS as explained above), "Auntie Bidoof," an alt used by N.M.P., told G.A.G. that she knows she is in middle school, and "Wiseau" states that he knows she is 12 years old. In addition to calling G.A.G. epithets such as "fat," "ugly," "bitch," and "whore," various participants in the conversation told G.A.G. that she is suicidal and has penises in her mouth, said that they want to have sex with her, said that she has had anal sex, charged that she has had an incestuous relationship with her younger brother, and recommended that she should kill herself. N.M.P. told G.A.G. they have her address. G.A.G. asked the group why they hate her so much, and "Wiseau" replied "we have told you what is required to get us to stop." N.M.P. posted a photo of G.A.G.'s mother. G.A.G. responded that she is the only parent she has and asked the group to stop stalking her family. "Wiseau"

replied "you know what will make us stop" and that her mom is a whore like G.A.G.

      ii.  The group members also told G.A.G. that they had sent a letter containing anthrax to her online boyfriend "Louis Tomkins," and that the poisonous letter would arrive in three days.  (In fact, my investigation has revealed that Tomkins is actually a soxpuppet controlled by SEARS.)

      iii. On December 6, 2012, Wiseau (SEARS) posted in a chat on his account -0188 that "[G.A.G.] and [J.L.H.] are both 12."  From SEARS' residence, a screen capture was posted to the "Wiseau" account (-0188) controlled by SEARS.  The screen-capture depicted a conversation in which J.L.H. had participated.  The uploader titled the picture "I go into J's account, remove her from every page except one G was manager on and she wasn't."

      iv.  The day after the December 6 incident, G.A.G. wrote to "Louis Tomkins" (whom I believe to be a Soxpuppet controlled by SEARS) that "They say it will all stop if I give them Nudes.  It's not gonna stop.  Because I won't give them nudes."  "Tomkins" responded that "I hate to say this… to even think about giving them what they want… but u might have to take a nude pic for them… if that's the only way it will stop."

g.   On December 7, 2012, "Tommy Wiseau" wrote the following statements in his -0188 account:

i.    "Things have changed a lot since I made this group originally.  Hijacking was still always around.  The Union was strong and still together.  BHTC was still around.  Gabi hadn't become a monster.  Trolling was easier.  Nobody got banned from posting anything at all if someone reported it enough."

ii.   "I made it intentionally with no rules.  I didn't like how Josh ran everything with an iron fist in BHTC.  So I set out to do the exact opposite."

iii.  "I do wish I could make a new group to try to keep the old setting we had that we loved.  I've thought about it a lot.  There's just no way to do it right now.".

iv.   "Because the group would immediately die off while also killing the Confederacy."

h.   On December 10, 2012, three images were uploaded from SEARS's residence with the title "[J.K.], popular figure in the community, probably underage."  The first image depicted a young male standing in front of a mirror with a camera phone, the last image is a close up of a penis.

i.    On December 10, 2012, SEARS was in a texting conversation with "Auntie Bidoof" on account -5297.  "Bidoof" asked, "What are you even doing with Louis and [G (G.A.G.)]

now…?"   SEARS replies "Basically I log onto Louis, see me tagged in that, [G. (G.A.G.)] messages me, I play it by ear…  [G. (G.A.G.)] and [J. (J.L.H.)] have been constantly fighting over Louis anyway.  The mere existence of the sockpuppet has destroyed their friendship…"  "Bidoof" replies that "we just need G's [G.A.G.'s] nudes and everything will be set."

j.   On December 11, 2012, "Wiseau" on account -0188 posted to "The Confederacy" group page a text conversation between A.R. and "Justin JerryBieber."  A.R. writes "You're my Idol Justin Bieber."  JerryBieber responds "aww thank u"  A.R. writes "your 18 and im like 15 but whattteverr…"  In the conversation, JerryBieber tells A.R. he wants to see her naked before he flies her out on his private jet to meet in person. JerryBieber tells A.R. that he would sing to her before they had sex and asks A.R. to send him pictures.  Based on my review of a totality of the returns, it appears that SEARS is using the soxpuppet "Justin JerryBieber," representing himself as the singer Justin Bieber, and attempting to obtain nude images of a 15-year-old female.

k.   On December 13, 2012, images of a cartoon chalkboard with the phase "The Confederacy" and "Confederacy Recruits" written on them were uploaded from IP address 24.152.223.168 and posted on the "Trixies" account -1680.  In

the comments, "Trixies" posted the text "I can change the text to say 'Confederate Recruits'."

1.    During December 13-15, 2012, SEARS had control over J.L.H.'s Facebook account and posted nude images of her there for her friends and/or members of the public to see.

i.    On December 13, 2012, a series of four nude images of J.L.H. were posted on her Facebook account ending in -7364.  These uploads occurred from IP addresses assigned to proxy servers.  Proxy servers are frequently used to mask someone's source IP address.  That same day, someone at SEARS's residence uploaded two screenshots of J.L.H. nude to SEARS's Facebook account ending in -5297.  The title of the second image was "My last post on her account for now."  Later that day, SEARS posted text in his -5297 account saying that "because I'm controlling her account.  I'm saying all of this."  An associate asked "Which one G [G.A.G.] or J [J.L.H.]?"  SEARS replied "J."

ii.   On December 14, 2012, SEARS posted a text to his -5297 account, saying "just realized I set Louis the sockpuppet's birthday for the 21st.  The day the world is supposed to end."

iii.  On December 15, 2012, a series of eight nude images of J.L.H. were uploaded from an IP addresses assigned to a proxy server, and posted to J.L.H.'s -7364 Facebook account.  Two of those images depicted J.L.H. nude, lying on her back with

her legs spread, touching her genitalia in masturbation or in a lascivious display. The camera is between her legs and focused on her genitalia. The title of one of the images is "Mmmm it turned me on seeing those kids get killed." (I believe this is a reference to the Sandy Hook Elementary School shooting which occurred on December 14, 2012.) On this same day, someone at SEARS's residence uploaded two nude images of J.L.H. to J.L.H.'s same Facebook account.

iv. On December 15, 2012, three nude images of J.L.H. were uploaded from IP address 24.152.223.168 (linked to M.N.P.) and pasted to the "Trixies" account ending in -1680. Two of those images depicted J.L.H. nude, lying on her back with her legs spread, touching her genitalia in masturbation or a lascivious display. The camera is between her legs and focused on her genitalia.

m. On December 15, 2012, Facebook member "Trixies" made a post in the -1680 account, "I'm going back to fucking with our greatest hits of 2012. [Y], [C], [G], and [J], and probably the old BHTC cronies soon."

n. On December 16, 2012, Facebook member "Trixies," on her account ending in -1680, texted "Speaking of stalking beliebers, I accidentally got a month-long subscription on that site I used to find [G]'s (Gracy's) address. So if you want to

22

get any nudes, anywhere between today and January 15th would be the time."

25.   On March 8, 2013, J.L.H. was interviewed by FBI SA Suzanne Lewis-Johnson at the Child Advocacy Center in New Philadelphia, Ohio.  J.L.H.'s date of birth is xx/xx/2000. According to J.L.H., G.A.G. met "Louis Tomkins" online and began to date him online within two weeks.  In "Tomkins's" Facebook picture, he appeared to be 15 to 16 years old.  J.L.H. gave "Tomkins" her Facebook password to one of her accounts.  This is the same account that was taken over by the person who posted her photos.  After she shared her password, she changed them right away.  "Tommy Wiseau" contacted both J.L.H. and G.A.G. and requested "shirt up" photos.  They refused, but "Wiseau" continued to harass them.  "Wiseau" threatened to cut the power to the hospital where Tomkin's mother was allegedly a patient. G.A.G. was very distraught over the matter, so J.L.H. got on web camera to "save" "Tomkins," "Tomkins's" mother, and G.A.G.

26.   Between March 11, 2013, and April 4, 2013, I sent Facebook preservation requests requesting that information associated with each of the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

27.   On 04/17/2013, Facebook provided returns to a Federal Grand Jury Subpoena for information concerning the accounts

referenced in this search warrant.  The following information
was obtained:

28.  Account:        502805716425633

     Name:           Kai's secret stash

     Creator:        Tommy Wiseau (100002506960188)

     Registration: 06/08/2011

     Closed:         12/17/2012

     Notes:  Login/Logout IP address information provide
from 12/05/2012 to 12/17/2012.  Of the approximately 170
logins/logoffs which occurred during this time frame, the
vast majority occurred from IP address 99.105.107.189.

29.  Account:        123346427808152

     Name:           Confederate Recruits

     Creator:        Drew V. Rodriquez (100000330233490)

     Registration: 10/08/2009

     Closed:         12/17/2012

     Notes:  Login/Logout IP address information provide
from 12/14/2012 to 12/17/2012.

30.  Account:        101979619967010

     Name:           Reconstruction

     Creator:         Jeremy Sears (100004298823439)

     Registration:   08/30/2012

     Closed:         12/17/2012

Notes:   Login/Logout IP address information provide from 11/12/2012 to 12/17/2012.   Of the approximately 140 logins/logoffs which occurred during this time frame, the vast majority occurred from IP address 99.105.107.189.

31.   Account:          100004437309136

    Name:             Louis Tompkins

    Creator:          No information

    Registration:     No information

    Closed:           12/16/2012

Notes:   Login/Logout IP address information provide from 11/11/2012 to 12/17/2012.   Of the approximately 260 logins/logoffs which occurred during this time frame, the vast majority occurred from IP address 99.105.107.189.

32.   Account:          536684223025730

    Name:             Speakeasy

    Creator:          Jeremy Sears (100004697555297)

    Registration:     11/21/2012

    Closed:           12/17/2012

Notes:   Login/Logout IP address information provide from 12/05/2012 to 12/17/2012.   Of the approximately 220 logins/logoffs which occurred during this time frame, the vast majority occurred from IP address 99.105.107.189.

33.  Account:       341813689243547

     Name:          Confederacy: MY EYES! THE GOGGLES DO

NOTHING!

     Creator:       Jeremy Sears (100004298823439)

     Registration: 08/30/2012

     Closed:        12/17/2012

     Notes:  Login/Logout IP address information provide

from 12/05/2012 to 11/12/2012.  Of the approximately 140

logins/logoffs which occurred during this time frame, the

vast majority occurred from IP address 99.105.107.189.

34.  No information was provided on the following accounts:[4]

     a.  Account:       376007025786404

         Name:          Confederacy NSFW: Porn, Gore,

     etc.

     b.  Account:       254730454633372

         Name:          Confederacy Archives

-----

[4] It is possible that no information was returned on these
accounts because such information had already been deleted.
Nevertheless, I seek to include these accounts in this search
warrant, since (i) the information on these accounts may in fact
exist and be located by Facebook notwithstanding their failure
to return it in response to the subpoena; (ii) the warrant seeks
more comprehensive information than the subpoena, such that
nonexistence of subpoena-responsive information does not mean
that there will be no warrant-responsive information on these
accounts; and (iii) if the information does not exist, then
nothing will be copied and no Fourth Amendment interests will be
affected.

c.   Account:          250114361763215

Name:              The Confederacy

35.   Based on the foregoing, I believe there is probable cause to believe that additional evidence of the production, receipt, distribution, and possession of child pornography may be found within the shared group accounts associated with The Confederacy.  Other victims and subjects will likely be identified.

## V.   NEED FOR CONTENTS

36.   I know from my training and experience that the complete contents of social-networking user accounts may be important to establishing the actual user who has dominion and control of a profile account at a given time.  Profile accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which profile accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of a profile account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a subject account.  Only by piecing together information contained in the contents of an account may an investigator establish who was the actual user of an account.  Often those pieces will come from a

time period before the account was used in the criminal activity. Limiting the scope of the search for information showing the actual user of the account would, in some instances, prevent the government from identifying the user of the account and, in other instances, prevent a defendant from suggesting that someone else was responsible. Therefore, the content of a given account, including the e-mail accounts that send messages to a given subject account, often provides important evidence regarding the actual user's dominion and control of a profile account. For the purpose of searching for profile content demonstrating the actual user of the account, I am requesting a warrant requiring the PROVIDER to turn over all of the contents of each SUBJECT ACCOUNT from November 1, 2012, through December 18, 2012, for review by the search team.

37. Relatedly, the government must be allowed to determine whether other individuals had access to the account. If the government were constrained to review only a small subsection of a profile account, that small subsection might give the misleading impression that only a single user had access to the account.

38. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases, such as "lol" to express "laugh out loud"), or codewords (which require entire

strings or series of e-mail conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea, such as a happy face inserted into the content of an e mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities. As a result, actual review of the contents of an e-mail account by law enforcement personnel with information regarding the identified criminal activity, subject to certain protocols, is necessary to find all relevant evidence within the account.

39. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER under seal until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for the PROVIDER to authenticate information taken from the account as its business record without the original production to examine. Even if the PROVIDER kept an original

copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the PROVIDER to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the PROVIDER to examine a particular document found by the search team and confirm that it was a business record of the PROVIDER's taken from the SUBJECT ACCOUNTS.

      b.   Preserving evidence would also ensure that the government can satisfy its <u>Brady</u> obligations and give any future defendant access to evidence that might be used in his or her defense.

## VI.  <u>REQUEST FOR NON-DISCLOSURE</u>

40.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscribers of the SUBJECT ACCOUNTS, of the existence of the warrant, because there is reason to believe that such notification will result in (1) destruction of or tampering with evidence, or (2) intimidation of potential witnesses (many of whom are minors), or (3) will seriously jeopardize the investigation.  The current investigation set forth above is not public, and I know, based on my training and experience, that computer attackers who send extortionate threats -- as well as those possessing or distributing child

pornography -- often will destroy digital evidence if the attacker learns of an investigation.  In addition, the conspirators' apparent modus operandi is to target vulnerable minors, then expose them to public humiliation (as with the hijacking of J.L.H.'s account to post nude photos of her.)  Given that, there is a very serious concern that intimidation and threats (such as the threat to further expose embarrassing photos) could be used to intimidate minor victims -- especially those not yet identified by law enforcement -- into withholding or destroying evidence, if the owners of the SUBJECT ACCOUNTS became aware of this investigation.

### VII. CONCLUSION

41.  Based on the foregoing, I request that the Court issue the requested search warrant.

_____
DAVID B. HAND
Special Agent, Federal Bureau
of Investigation

Subscribed and sworn to before
me on June ___, 2013.

STEPHEN J. HILLMAN

_____
HON. STEPHEN J. HILLMAN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

### for the
### Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 5 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

4468 Autumnglen Court,
Moorpark, California 93021

Case No. M 13 - 02223

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description |
|---|---|
| 18 USC 2251(a) (producing child pornography) 2252A(a)(2)(A), (3)(B), (5)(B), () (distrib/receiving/possess child pornog. / enterprise), 1030(a)(4) (computer fraud), 875 (threats) 371 (conspiracy) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bernard Riedel, Jr., Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8-15-13

ALICIA G. ROSENBERG
*Judge's signature*

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Joshua Klein

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The premises to be searched (the SUBJECT PREMISES) is the property located at 4468 Autumnglen Court, in the city of Moorpark, California 93021, in Ventura County; further identified as the residence of Jeremy SEARS; further described as a residential lot improved by a free-standing two-story dwelling house featuring a gray flat tile roof, a light gray wood siding exterior with white fascia trim, a natural colored oak front door, covered with a blue colored wood screen door. The numbers "4468," black in color on white tile, are attached vertically to the wood siding exterior, facing west, on the north side of the two-car garage on the west corner of the house.  The numbers "4468" are also painted on the curb in front of the property.

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I. **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875 (interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371. namely:

   a.   Any child pornography, as defined by Title 18, United States Code, Section 2256.

   b.   Any correspondence or records indicating the true identify of "Tommy Wiseau" or "Meenah Trixies," or the users of the following Facebook Accounts identified in Warrant No. 13-01540-M (with primary users indicated in parentheses): 107139918 (Jeremy Sears), 100004887818228 (Jeremy Sears), 100004697555297 (Jeremy Sears), 100002506960188 (Tommy Wiseau), 100001264261680 (Meenah Trixies), 100004437309136 ("Louis Tomkins").

c.    Any correspondence or records indicating the name, identity, address, or other contact and identifying information of users or members of the following Facebook group accounts identified in Warrant No. 13-01540-M: 250114361763215 (The Confederacy); 123346427808152 (Confederate Recruits); 341813689243547 (Confederacy: MY EYES! THE GOGGLES DO NOTHING!); 376007025786404 (Confederacy NSFW: Porn, Gore, etc); 254730454633372 (Confederacy Archives); 101979619967010 (Reconstruction);

d.    Any and all notes, documents, records, or correspondence (including but not limited to envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files, browser history, and cache information), in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

e.    Any and all diaries, correspondence, address books, names, and lists of names and contact information of individuals who may have been contacted by Jeremy SEARS for the purpose of creating, distributing, receiving, or possessing child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of

minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

    f.    Any and all notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

    g.    Any and all information giving user names, passwords, or other account information of accounts with Facebook or other providers used by Jeremy SEARS.

    h.    Any and all records, correspondence, documents, invoices, and materials, in any format or medium, concerning online storage or other remote computer storage, including (but not limited to) software used to access such storage, logs or archived data showing connection to such storage, and user logins and passwords for such storage.

    i.    Any and all visual depictions of minors.

    j.    Any and all diaries, notebooks, notes, and other records reflecting personal or electronic contact with minors encouraging or discussing the minors' taking of visual depictions of themselves engaged in sexually explicit behavior.

    k.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

    l.    Any wallet or cellular telephone appearing to belong to M.N. (who complained about SEARS to the Ventura County

Sheriff's Department on August 15, 2013) belonging to any other minor who is not a member of SEARS' household.

m.    With respect to any digital device containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of the same, sufficient to show the actual user(s) of the digital device during the time period between June 1, 2012 and August 15, 2013.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of

items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use sophisticated hashing tools, such as tools for identifying child pornography, including "EnCase" and "FTK" (Forensic Tool Kit)."

c.   When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.   The government may retain a digital device itself, and/or entire forensic copies of it, until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or] the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device and/or forensic copies of it (or while an application for such an order is pending).   Otherwise, the government must return the device and delete or destroy all forensic copies thereof.

h.   Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Bernard Riedel, Jr., being duly sworn, do hereby declare and state:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed since 1996. During that time, I have investigated crimes including terrorism, public corruption, civil rights. From 2004 through 2011, I was on a task force investigating Internet crimes against children. During that time, I investigated numerous child pornography and child exploitation offenses, and wrote and executed numerous search warrants. I received training in the subject of child pornography investigation, and training in analysis of computer evidence, and I have engaged in numerous examinations of computer evidence. I am currently assigned to investigation of violent crimes in the Central District of California.

2.    This affidavit is being made in support of an application for a search warrant for 4468 Autumnglen Court, Moorpark, California, 93021 (the "SUBJECT PREMISES," described in Attachment A attached hereto and made a part hereof), for fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child

pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875 (interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371.

3.    In addition to the facts otherwise stated in this affidavit, this application and affidavit incorporates the prior sealed search warrant and application for search warrant in Case No. 13-01540-M, which are each attached hereto as Exhibit A and are incorporated in whole as part of this application and affidavit.  For a comprehensive statement of probable cause, the Court is respectfully referred to that warrant's affidavit.

4.    The statements in this Affidavit are additionally based on information provided by Special Agent ("SA") David Hand of the Federal Bureau of Investigation ("FBI"), who swore to the affidavit applying for warrant No. 13-01540-M, and who has investigated this case (including recent events described below), but who is this morning busy in Ventura County conducting investigation spurred by recent events in this case. The information herein is also based on information I received from Detective Mario Luna of the Ventura County Sherriff's Department Major Crimes Sexual Assault Unit.  Because this

affidavit is being submitted for the limited purpose of securing a search warrant and demonstrating probable cause, this affidavit does not set forth each and every fact known to me or known to this investigation.

## II.  PREMISES TO BE SEARCHED

5.   The premises to be searched (the SUBJECT PREMISES), further described in Attachment A (attached hereto and incorporated herein) is the property located at 4468 Autumnglen Court, in the city of Moorpark, California 93021, in Ventura County.  The SUBJECT PREMISES are further identified as the residence of Jeremy SEARS, and are further described as a residential lot improved by a free-standing two-story dwelling house featuring a gray flat tile roof, a light gray wood siding exterior with white fascia trim, a natural colored oak front door, covered with a blue colored wood screen door.  The numbers "4468," black in color on white tile, are attached vertically to the wood siding exterior, facing west, on the north side of the two-car garage on the west corner of the house.  The numbers "4468" are also painted on the curb in front of the property.

## III. BRIEF SUMMARY

6.   The FBI's investigation has revealed that Jeremy Brendan SEARS, an adult male (approximately 22 years old) domiciled in Moorpark, California, in the Central District of California, together with several coconspirators, has (1)

tricked, threatened, harassed, and extorted minors into producing sexually explicit, lascivious, and naked photographs of themselves and into sending those photographs to conspirators, who then (2) possessed and distributed the photographs further.  SEARS and his coconspirators' primary method of accomplishing these goals was to use false identities or pose as celebrities in order to meet and befriend the minor victims through Facebook or other social networking sites.  By various means, the conspirators would then trick, harass, and extort the minors into producing and sending the exploitative photos -- sometimes by threatening harm to the minors themselves or to the people whose false identities the conspirators had assumed.  The conspirators stored and distributed the exploitative photographs -- including by gaining control of one victim's Facebook accounts to post the exploitative photographs there, where they could be seen by the victim's friends and acquaintances.

    7.    SEARS and his coconspirators did this as members of The Confederacy -- an online social group which appears to have focused on harassing and bullying victims by means of "trolling" and "hijacking."  "Trolling" is internet slang for the activity of posting inflammatory messages in an online forum, chat room, or blog, with the intent of provoking an emotional response from the members.  "Hijacking" means to gain administrative control

over someone else's social network account.   The Confederacy
primarily targeted fans of the singer Justin Bieber and the
singing group One Direction -- fans known as "Beliebers" and
"Directioners."   Confederacy group members use "alts"
(alternatives or alias) and "soxpuppets" to disguise their
identity.   "Soxpuppets" are fictitious accounts created by
Confederacy members to engage and befriend potential victims.
Among the members of the Confederacy are SEARS (an adult male
Californian), and M.N.P.,[1] a 12-year-old female living in Denver,
Pennsylvania.   The FBI's investigation is described in further
detail in Exhibit A.

8.    The FBI investigation has determined that the SUBJECT
PREMISES is the home of Jeremy SEARS ("SEARS"), and is the
location from which SEARS has used his computers and internet
access to entice underage persons into creating and sending him
child pornography, including lewd and lascivious displays of the
victims' genitalia, and depictions of them masturbating.

IV.   **EVENTS THIS MORNING**

9.    I have spoken this morning with Mario Luna, Detective
with the Ventura County Sherriff's Office.   Det. Luna told me

---

[1] In this Affidavit, initials will be used to reference the
names of minors -- whether victims or suspected perpetrators --
as well as the names of certain adults (such as apparent parents
and other relatives) from whom the minors' names could be
derived.

5

that this morning, a complainant with the initials M.N., a 17-year-old male contacted the Sheriff's Office.

10. M.N. said he had been on the Internet on or about Monday August 12, 2013, on the website MeetMe.com trying to meet up with a person (later identified as SEARS) whose profile on the website described her as a female teenager named "Rachel". M.N. reports that the purported female told M.N. to send naked photos of himself to her, which M.N. did. M.N. reports that the purported female sent M.N. a nude photograph of a female apparently of teenage age. The purported female and M.N. set up a meeting at Arroyo Vista Park, a public park in the City of Moorpark, in Ventura County, for approximately 1 a.m. Monday morning. M.N. reported that when he arrived at the park, instead of the female there was a male there, later identified as SEARS. The male (SEARS) said that "Rachel" was his sister who was due to arrive shortly, and said that M.N. should get naked so that the sister would be excited by him when she arrived. M.N. reports that in response to SEARS' statements, M.N. did get naked in the park and waited there about 2 hours, walking (while naked) to follow SEARS, since SEARS said he was taking M.N. to meet Rachel. M.N. reports that the purported female never arrived, and that SEARS held on to M.N.'s clothes and refused to return them to M.N., so that M.N. had to leave mostly naked (though wrapped in a towel M.N. had in his car).

M.N. reports that SEARS also had M.N.'s wallet and phone and did not return them.

11.   M.N. reports that after that, he got on the same website again, communicating with a different purported female, who said she was "Rachel's" sister. M.N. agreed to meet to meet the "sister" in the early morning hours of August 15, 2013, in the same general vicinity. Once again, M.N. arrived and found that, instead of the female "sister," the person there was the male later identified as SEARS. SEARS once again enticed M.N. to remove his clothes. SEARS asked M.N. to turn around. M.N. kept his clothes closer to him this time, and asked SEARS for M.N.'s clothes and wallet from last time, which SEARS again refused to give him. M.N. left -- this time wearing his clothes. Later in the morning M.N. and SEARS communicated by text-messages, with M.N. still asking for his clothes and wallet back. SEARS told M.N. that unless M.N. agreed to meet with SEARS again, SEARS would post on the Internet the nude pictures that M.N. had previously sent to "Rachel."

12.   M.N. contacted authorities that day (August 15, 2013). M.N. and SEARS arranged to meet at in the vicinity of Arroyo Vista Park later that morning. Ventura County Sheriff's Deputies were present when SEARS showed up. M.N. positively identified SEARS as the male who had met with him earlier that

morning and on Monday morning, and who had taken his clothes on Monday morning.

13. SEARS was arrested, and was advised of his Miranda rights and he waived them. In an interview with the Ventura County Sherriff's Department, SEARS admitted that he had gone on the Internet, searching for boys and girls aged 15 to 17 to meet up with. He said that if he was targeting a girl, he would pose as a boy; if he was targeting a boy, he would pose as a girl. He admitted to sending a nude image to M.N. and to asking M.N. and receiving from M.N. at least four nude photos of M.N. SEARS said he has been doing it since he was 17, and said he has recently been targeting more boys than girls. He admitted meeting M.N. both times at the park and telling M.N. to take off his clothes. He said he had uploaded approximately four nude photos of M.N. on an Internet website ugotposted.com, but said he was not sure whether the website had made the photos available to others yet, because there is some sort of delay. He denied taking pictures of M.N. at the park while M.N. was nude. He admitted to having nude images of 15-17 year olds on his laptop, desktop, and various hard-drives at home. He admitted to having M.N.'s wallet and phone at one point on Monday while SEARS made M.N. walk for some distance nude (purportedly so SEARS could bring M.N. to "Rachel"), but SEARS said he thinks he lost the wallet and phone during the walk.

14.     SEARS has identified 4468 Autumnglen Ct., Moorpark, California as his address.  He has further granted the Ventura County Sherriff's Department consent to go to that address and seize digital devices.[2]

## V.   PRELIMINARY RESULTS FROM WARRANT NO. 13-01540-M

15.     Today, I also spoke with FBI SA David Hand, the case agent on this federal investigation.  Although SA Hand is currently in Ventura County investigating the M.N. events and their relationship to this ongoing federal investigation, he briefed me on the preliminary results from Warrant No. 13-01540.  Warrant No. 13-01540 was served on Facebook, Inc., which sent the FBI thousands of pages of responsive material, which SA Hand has been reviewing.  SA Hand said that that material from The Confederacy account has confirmed that SEARS used The Confederacy account to contact underage females, to gain naked and pornographic images of them, and to post those pictures in places where they could be received by other people.

16.     SA Hand said, additionally, that his preliminary examination of the material Facebook provided from The Confederacy account included photos of J.L.H., a then-12-year-old victim described in the affidavit for Warrant No. 13-01540.  The photos depicted J.L.H. naked and masturbating.  In addition,

---

[2] Notwithstanding that consent, this warrant is being sought as a precautionary measure.

SA Hand said The Confederacy materials contained a nude photo of a new victim, A.A., who appears to be from Australia, and whose age (according to indications in the messages on The Confederacy account) appears to be 16 years old.

17.     SA Hand further said to me that the information Facebook provided from The Confederacy account includes images showing screen-captures of internet-messaging conversations with both J.L.H. and A.A.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic

examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

19.   In addition to what has been described herein, the United States has been informed that state authorities (the Ventura County Sherriff's Department) has received written consent to seize and search certain of SEARS' computers at his house.  However, it is not currently known precisely what the scope of that consent is.  In an abundance of caution, the United States, in any event, seeks this search warrant to ensure the legality of any search.

15

## VII.  TRAINING/EXPERIENCE ON CHILD PORNOGRAPHY AND THE INTERNET

20.    Based on my knowledge, training and experience, and the experience of other law enforcement officers with whom I have communicated, I have knowledge of the Internet and how it operates.  I know that the Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information.  Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

21.    Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other, and their victims.  Child pornography formerly was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  There were definable costs involved with the production of pornographic images. To distribute these images on any scale required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The

16

distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

22.    The development of computers has changed this; computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.    Child pornographers can now create child pornography without even being in the same room as their victims.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.    Electronic contact can be made to literally millions of computers around the world.    A device known as a "web camera," also known as a "web cam," allows producers to view their victims live over the Internet in "real time."    If the victim is being molested, or otherwise engaging in sexually explicit conduct, the child pornographer can watch it occur as if they were in the room.    Using children to engage in sexually explicit conduct for the purpose of live Internet transmission has been criminalized by Title 18, United States Code, Section 2251(a).

23.    Furthermore, child pornographers can use software to "save" or "capture" the sexually explicit images of children appearing live on their computer screen.    Thus, the child pornographer has used children engaged in sexually explicit conduct to produce a visual depiction of such conduct – which is

17

production of child pornography, in violation of Title 18, United States Code, Section 2251(a).

24.   Digital images, such as those created using the computer, are then easily transferable to others via the Internet.

## Internet Service Providers

25.   Many individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

IP Addresses

26.   An Internet Protocol address ("IP address") is a unique numeric address used by each computer on the Internet.

An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

27. When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.

28. In my training and experience, producers, possessors, and distributors of child pornography often keep large collections of their child pornography on various storage media, under various filenames. In addition, because computer storage information is not necessarily completely overwritten when deleted, examination of hard drives and storage media may show remnants of child pornography (or associated communications) even when there is no filename associated with the information or when any such filename does not explicitly mention the pornographic nature of the content.

## VIII.    <u>CONCLUSION</u>

29.    Based on the foregoing, and on the information in the affidavit to the warrant number 13-01540-M, I request that the Court issue the requested search warrant.

_____
BERNARD RIEDEL JR.
Special Agent, Federal Bureau
of Investigation

Subscribed and sworn to before
me on August 15, 2013.
ALICIA G. ROSENBERG
_____
HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

20

AO 93  (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT



### for the
### Central District of California

In the Matter of the Search of                     )
*(Briefly describe the property to be searched*     )
*or identify the person by name and address)*       )   Case No.
4468 Autumnglen Court,                             )
Moorpark, California  93021                        )
                                                   )

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location):*

    See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

    See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before   14 days from the date of its issuance
                                                              *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been
                                                established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
on duty at the time of the return through a filing with the Clerk's Office.
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

                                    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   8-15-13   2:10pm          ALICIA G. ROSENBERG
                                                  _____
                                                          *Judge's signature*

City and state:   Los Angeles, California          Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
                                                          *Printed name and title*

AUSA: Joshua Klein

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant ~~and inventory~~ left with: |

*Inventory made in the presence of :*

*Inventory of the property taken and name of any person(s) seized:*
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

*Certification* (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The premises to be searched (the SUBJECT PREMISES) is the property located at 4468 Autumnglen Court, in the city of Moorpark, California 93021, in Ventura County; further identified as the residence of Jeremy SEARS; further described as a residential lot improved by a free-standing two-story dwelling house featuring a gray flat tile roof, a light gray wood siding exterior with white fascia trim, a natural colored oak front door, covered with a blue colored wood screen door. The numbers "4468," black in color on white tile, are attached vertically to the wood siding exterior, facing west, on the north side of the two-car garage on the west corner of the house.  The numbers "4468" are also painted on the curb in front of the property.

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251(a) (producing/enticing child pornography), 18 U.S.C. § 2252A(a)(2)(A) (distribution and receipt of child pornography), 18 U.S.C. § 2252A(a)(3)(B) (advertisement of child pornography), 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), 18 U.S.C. § 2252A(g) (engaging in child exploitation enterprise), 18 U.S.C. § 1030(a)(4) (computer fraud), and 18 U.S.C. § 875 (interstate threatening communications) -- as well as conspiracy to violate the aforementioned sections under 18 U.S.C. § 371, namely:

  a.   Any child pornography, as defined by Title 18, United States Code, Section 2256.

  b.   Any correspondence or records indicating the true identify of "Tommy Wiseau" or "Meenah Trixies," or the users of the following Facebook Accounts identified in Warrant No. 13-01540-M (with primary users indicated in parentheses): 107139918 (Jeremy Sears), 100004887818228 (Jeremy Sears), 100004697555297 (Jeremy Sears), 100002506960188 (Tommy Wiseau), 100001264261680 (Meenah Trixies), 100004437309136 ("Louis Tomkins").

c.    Any correspondence or records indicating the name, identity, address, or other contact and identifying information of users or members of the following Facebook group accounts identified in Warrant No. 13-01540-M: 250114361763215 (The Confederacy); 123346427808152 (Confederate Recruits); 341813689243547 (Confederacy: MY EYES! THE GOGGLES DO NOTHING!); 376007025786404 (Confederacy NSFW: Porn, Gore, etc); 254730454633372 (Confederacy Archives); 101979619967010 (Reconstruction);

d.    Any and all notes, documents, records, or correspondence (including but not limited to envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files, browser history, and cache information), in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

e.    Any and all diaries, correspondence, address books, names, and lists of names and contact information of individuals who may have been contacted by Jeremy SEARS for the purpose of creating, distributing, receiving, or possessing child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of

minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

  f. Any and all notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

  g. Any and all information giving user names, passwords, or other account information of accounts with Facebook or other providers used by Jeremy SEARS.

  h. Any and all records, correspondence, documents, invoices, and materials, in any format or medium, concerning online storage or other remote computer storage, including (but not limited to) software used to access such storage, logs or archived data showing connection to such storage, and user logins and passwords for such storage.

  i. Any and all visual depictions of minors.

  j. Any and all diaries, notebooks, notes, and other records reflecting personal or electronic contact with minors encouraging or discussing the minors' taking of visual depictions of themselves engaged in sexually explicit behavior.

  k. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

  l. Any wallet or cellular telephone appearing to belong to M.N. (who complained about SEARS to the Ventura County

Sherriff's Department on August 15, 2013) belonging to any other minor who is not a member of SEARS' household.

       m.  With respect to any digital device containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of the same, sufficient to show the actual user(s) of the digital device during the time period between June 1, 2012 and August 15, 2013.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of

items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use sophisticated hashing tools, such as tools for identifying child pornography, including "EnCase" and "FTK" (Forensic Tool Kit)."

      c.  When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

      d.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      e.  If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       f.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       g.    The government may retain a digital device itself, and/or entire forensic copies of it, until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or] the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device and/or forensic copies of it (or while an application for such an order is pending).  Otherwise, the government must return the device and delete or destroy all forensic copies thereof.

       h.    Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.