STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JENNIFER Y. CHOU (Cal. Bar No. 238142)
Assistant United States Attorney
Violent & Organized Crime Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6482
    Facsimile: (213) 894-3713
    E-mail:   jennifer.chou@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 14-274(A)-JFW |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT JEREMY BRENDAN SEARS |
| v. | |
| JEREMY BRENDAN SEARS, | |
| Defendant. | |

1.   This constitutes the plea agreement between JEREMY BRENDAN SEARS ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>RULE 11(c)(1)(C) AGREEMENT</u>

2.   Defendant understands that this agreement is entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  Accordingly, defendant understands that, if the Court determines that it will not accept this agreement, absent a breach of this agreement

by defendant prior to that determination and whether or not defendant elects to withdraw any guilty plea entered pursuant to this agreement, this agreement will, with the exception of paragraph 24 below, be rendered null and void and both defendant and the USAO will be relieved of their obligations under this agreement.  Defendant agrees, however, that if defendant breaches this agreement prior to the Court's determination whether or not to accept this agreement, the breach provisions of this agreement, paragraphs 27 and 28 below, will control, with the result that defendant will not be able to withdraw any guilty plea entered pursuant to this agreement, the USAO will be relieved of all of its obligations under this agreement, and the Court's failure to follow any recommendation or request regarding sentence set forth in this agreement will not provide a basis for defendant to withdraw defendant's guilty plea.

<u>DEFENDANT'S OBLIGATIONS</u>

3.   Defendant agrees to:

a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count 8 of the superseding indictment in <u>United States v. Jeremy Brendan Sears</u>, CR No. 14-274(A)-JFW, which charges defendant with production of child pornography, in violation of 18 U.S.C. § 2251(a), (e).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement and affirmatively recommend to the Court that it impose sentence in accordance with paragraphs 14-18 of this agreement.

d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.    Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g.    Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

h.    Make restitution at or before the time of sentencing, and not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

i.    Agree to and not oppose as part of sentencing an order that defendant shall not contact victims C.G., M.A., P.R., A.A., G.G., J.H., G.G., L.Z., J.B., A.H., M.N., Y.K., N.L., and N.K. (collectively, the "victims") by any means, including in person, by mail or electronic means, or via third parties, during defendant's period of incarceration, effective immediately.

j.    Agree to and not oppose the imposition of the following conditions of probation or supervised release for a lifetime term of supervised release:

i.    Conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court;

3

         ii.   The drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d);

         iii.  The alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7);

         iv.   Defendant shall register as a sex offender, and keep the registration current, in each jurisdiction where he resides, where he is an employee, and where he is a student, to the extent the registration procedures have been established in each jurisdiction. When registering for the first time, defendant shall also register in the jurisdiction in which the conviction occurred if different from his jurisdiction of residence.  Defendant shall provide proof of registration to the Probation Officer within <u>three</u> days of release from imprisonment;

         v.    Defendant shall participate in a psychological counseling and/or psychiatric treatment and/or a sex offender treatment program, which may include inpatient treatment, upon further order of the Court.  Defendant shall abide by all rules, requirements, and conditions of such program, including submission to risk assessment evaluations and physiological testing, such as polygraph and Abel testing.  These physiological tests may not include plethsymograph testing absent further order from the Court;

         vi.   As directed by the Probation Officer and the Probation Officer's assessment of defendant's ability to pay, defendant shall pay all or part of the costs of treating defendant's psychological/psychiatric disorder(s) to the aftercare contractor during the period of community supervision, pursuant to 18 U.S.C.

§ 3672.  Defendant shall provide payment and proof of payment, as directed by the Probation Officer;

vii. Defendant shall not possess any materials, including pictures, photographs, books, writings, drawings, videos, or video games, depicting and/or describing "sexually explicit conduct," as defined at 18 U.S.C. § 2256(2);

viii.    Defendant shall not view or possess any materials, including pictures, photographs, books, writings, drawings, videos, or video games, depicting and/or describing child pornography, as defined in 18 U.S.C. § 2256(8).  This condition does not prohibit defendant from possessing materials solely because they are necessary to, and used for, a collateral attack, nor does it prohibit him from possessing materials prepared and used for the purposes of his court-mandated sex offender treatment, when defendant's treatment provider or the Probation Officer has approved of his possession of the material in advance;

ix.  Defendant shall not contact the victims identified in paragraph 3(i) by any means, including in person, by mail or electronic means, or via third parties, except with the written approval of the probation officer.  Further, the defendant shall remain at least 100 yards from the victims at all times.  If any contact occurs, the defendant shall immediately leave the area of contact, and report the contact to the Probation Officer;

x.  Defendant shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except: (a) in the presence of the parent or legal guardian of said minor; and (b) on the condition that the defendant notify said parent or legal guardian of his conviction in

1    the instant offense.   This provision does not encompass persons under

2    the age of 18, such as waiters, cashiers, ticket vendors, etc., with

3    whom defendant must deal with in order to obtain ordinary and usual

4    commercial services;

5              xi.  Defendant shall not affiliate with, own, control,

6    volunteer and/or be employed in any capacity by a business and or

7    organization that causes him to regularly contact persons under the

8    age of 18;

9              xii. Defendant shall not affiliate with, own, control,

10   and/or be employed in any capacity by a business whose principal

11   product is the production and/or selling of materials depicting

12   and/or describing "sexually explicit conduct," as defined at 18

13   U.S.C. § 2256(2);

14             xiii.   Defendant shall not own, use or have access

15   to the services of any commercial mail-receiving agency, nor shall he

16   open or maintain a post office box, without the prior approval of the

17   Probation Officer;

18             xiv. Defendant's employment shall be approved by the

19   Probation Officer, and any change in employment must be pre-approved

20   by the Probation Officer.  Defendant shall submit the name and

21   address of the proposed employer to the Probation Officer at least 10

22   days prior to any scheduled change;

23             xv.  Defendant shall not reside within direct view of

24   school yards, parks, public swimming pools, playgrounds, youth

25   centers, video arcade facilities, or other places primarily used by

26   persons under the age of 18.  Defendant's residence shall be approved

27   by the Probation Officer, and any change in residence must be pre-

28   approved by the Probation Officer.  Defendant shall submit the

address of the proposed residence to the Probation Officer at least 10 days prior to any scheduled move.  The only exception to this condition requires all three of the following: (1) defendant is residing with either his parents, Kip and Wendi Sears, or his grandparents, James and Barbara Smith; (2) the Probation Officer approves and authorizes such residency prior to defendant's commencement of such residency; and (3) defendant submits to electronic monitoring for the duration of such residency, with the cost of such monitoring to be paid by defendant at the direction of the Probation Officer;

xvi. Defendant shall not frequent, or loiter, within 100 feet of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18;

xvii.   Defendant shall submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and his effects to search at any time, with or without a warrant, by any law enforcement or Probation Officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by defendant, and by any Probation Officer in the lawful discharge of the officer's supervision functions;

xviii.   Defendant shall possess and use only those computers and computer-related devices, screen user names, passwords, email accounts, and internet service providers (ISPs), which have been disclosed to the Probation Officer upon commencement of supervision.  Any changes or additions are to be disclosed to the Probation Officer prior to the first use.  Computers and computer-

related devices are personal computers, personal data assistants

(PDAs), internet appliances, electronic games, cellular telephones,

and digital storage media, as well as their peripheral equipment,

that can access, or can be modified to access, the internet,

electronic bulletin boards, and other computers;

xix. All computers, computer-related devices, and

their peripheral equipment, used by defendant shall be subject to

search and seizure.  This shall not apply to items used at the

employment's site, which are maintained and monitored by the

employer;

xx.  Defendant shall comply with the rules and

regulations of the Computer Monitoring Program.  Defendant shall pay

the cost of the Computer Monitoring Program, in an amount not to

exceed $32 per month per device connected to the Internet; and

xxi. Defendant shall pay restitution to the victim(s)

as ordered by the Court, and not seek the discharge of any

restitution obligation, in whole or in part, in any present or future

bankruptcy proceeding.

<u>THE USAO'S OBLIGATIONS</u>

4.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained

in this agreement and affirmatively recommend to the Court that it

impose sentence in accordance with paragraphs 14-18 of this

agreement.

c.   At the time of sentencing, move to dismiss the

remaining counts of the superseding indictment and the underlying

indictment as against defendant.  Defendant agrees, however, that at

8

the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. §§ 2251(a), (e) (Production of Child Pornography); 18 U.S.C. §§ 2252A(a)(2), (b)(1) (Distribution and Attempted Distribution of Child Pornography); 18 U.S.C. §§ 2252A(a)(2), (b)(1) (Receipt of Child Pornography); and 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) (Possession of Child Pornography) arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 13 below and the attached Statement of Factual Basis regarding minor victims Y.K., N.L., and N.K.   Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.   Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

<u>NATURE OF THE OFFENSE</u>

5.   Defendant understands that for defendant to be guilty of the crime charged in count 8, that is, production of child pornography, in violation of 18 U.S.C. § 2251(a), (e), the following must be true: (1) At the time, the victim was under 18; (2) For the

9

purpose of producing a visual depiction of sexually explicit conduct or of transmitting a live depiction of such conduct, defendant employed, used, persuaded, or coerced the victim to take part in sexually explicit conduct; and (3) the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

PENALTIES AND RESTITUTION

6.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of production of child pornography, in violation of 18 U.S.C. § 2251(a), (e), is: 30 years' imprisonment; a lifetime period of supervised release; a fine of $250.000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7.   Defendant understands that the statutory mandatory minimum sentence that the Court must impose for a violation of production of child pornography, in violation of 18 U.S.C. § 2251(a), (e), is: 15 years' imprisonment, followed by a five-year period of supervised release, and a mandatory special assessment of $100.

8.   Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may

10

order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty; and (b) any counts dismissed and charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts and charges.

9.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the Court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that

11

1  unanticipated collateral consequences will not serve as grounds to

2  withdraw defendant's guilty plea.

3       11.  Defendant understands that, if defendant is not a United

4  States citizen, the felony conviction in this case may subject

5  defendant to: removal, also known as deportation, which may, under

6  some circumstances, be mandatory; denial of citizenship; and denial

7  of admission to the United States in the future.  The Court cannot,

8  and defendant's attorney also may not be able to, advise defendant

9  fully regarding the immigration consequences of the felony conviction

10 in this case.  Defendant understands that unexpected immigration

11 consequences will not serve as grounds to withdraw defendant's guilty

12 plea.

13      12.  Defendant understands that as a condition of supervised

14 release, under 18 U.S.C. § 3583(d), defendant will be required to

15 register as a sex offender.  Defendant understands that independent

16 of supervised release, he will be subject to federal and state

17 registration requirements, for a possible maximum term of

18 registration up to and including life.  Defendant further understands

19 that, under Title 18, United States Code, Section 4042(c), notice

20 will be provided to certain law enforcement agencies upon his release

21 from confinement following conviction.

22                              <u>FACTUAL BASIS</u>

23      13.  Defendant admits that defendant is, in fact, guilty of the

24 offense to which defendant is agreeing to plead guilty.  Defendant

25 and the USAO agree to the statement of facts provided in the attached

26 Statement of Factual Basis and agree that this statement of facts is

27 sufficient to support a plea of guilty to the charge described in

28 this agreement and to establish the Sentencing Guidelines factors set

forth in paragraph 15 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

<u>SENTENCING FACTORS AND AGREED-UPON SENTENCE</u>

14.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only.

15.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 32 | [USSG § 2G2.1(a)] |
| Minor Victim 12-16 Years Old | : | +2 | [USSG § 2G2.1(b)(1)(B)] |
| Sexual Contact | : | +2 | [USSG § 2G2.1(b)(2)(A)] |
| Distribution | : | +2 | [USSG § 2G1.1(b)(3)] |
| Misrepresentation of Identity/Use of a Computer or Internet | : | +2 | [USSG § 2G1.1(b)(6) |
| Grouping Adjustment | : | +5 | [USSG § 3D1.4] |
| Acceptance of Responsibility | : | -3 | [USSG § 3E1.1(b)] |
| Total Offense Level | : | 42 | |

16.  The parties agree not to argue that any other specific Guidelines offense characteristics, adjustments, or departures be imposed.

17.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

18.   Notwithstanding the Guidelines, defendant and the USAO agree that, taking into account the factors listed in 18 U.S.C. § 3553(a)(1)-(7), an appropriate disposition of this case is that the Court impose a sentence of: between 15 years' and 18 year's imprisonment; a lifetime period of supervised release with conditions to be fixed by the Court, which shall include the conditions set forth in paragraph 3(j); a fine in an amount to be determined by the Court; a $100 special assessment; and restitution as ordered by the Court.   The parties are free to argue for any sentence within the range specified in this paragraph.   The parties also agree that no prior imprisonment (other than credits that the Bureau of Prisons may allow under 18 U.S.C. § 3585(b)) may be credited against this stipulated sentence, including credit under Sentencing Guideline § 5G1.3.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel — and if necessary have the Court appoint counsel — at trial.   Defendant understands, however, that, defendant retains the right to be represented by counsel — and if necessary have the Court appoint counsel — at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

14

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF RETURN OF DIGITAL DATA</u>

20.    Understanding that the government has in its possession digital devices and/or digital media seized from defendant, defendant waives any right to the return of the digital devices and/or media or any digital data contained on those digital devices and/or digital media and agrees that if any of these digital devices and/or digital media are returned to defendant, the government may delete all digital data from those digital devices and/or digital media before they are returned to defendant

<u>WAIVER OF APPEAL OF CONVICTION</u>

21.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

22. Defendant agrees that, provided the Court imposes a sentence within the range specified in paragraph 18 above, defendant gives up the right to appeal any portion of that sentence.

23. The USAO agrees that, provided the Court imposes the sentence specified in paragraph 18 above, the USAO gives up its right to appeal any portion of that sentence.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

24. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## RESULT OF VACATUR, REVERSAL OR SET-ASIDE

25. Defendant agrees that if the count of conviction is vacated, reversed, or set aside, or any Guidelines enhancement imposed by the Court to which the parties stipulated in this agreement above in paragraph 15 is vacated or set aside, both the

16

USAO and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

26.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

27.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, (b) the USAO will be relieved of all its obligations under this agreement, and (c) the Court's failure to follow any recommendation or request regarding sentence set forth in this agreement will not provide a basis for defendant to withdraw defendant's guilty plea.

28.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND PROBATION OFFICE NOT PARTIES</u>

29.  Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts, sentencing factors, or sentencing.  Defendant understands that the Court will determine the facts, sentencing factors, and other considerations relevant to sentencing and will decide for itself whether to accept and agree to be bound by this agreement.

30.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations and sentence referenced in paragraphs 14-18 are consistent with the facts of this case.   While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

<u>NO ADDITIONAL AGREEMENTS</u>

31.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in Court.

1    <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2        32.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    STEPHANIE YONEKURA
     Acting United States Attorney

9

10   _____          12/29/14
                                               _____
11   JENNIFER P. CHOU                          Date
     Assistant United States Attorney

12   _____          12-29-14
                                               _____
13   JEREMY BRENDAN SEARS                      Date
     Defendant

14   _____          12/11/14
                                               _____
15   PAUL HORGAN, Esq.                         Date
     Attorney for Defendant
16   JEREMY BRENDAN SEARS

17

18

19

20

21

22

23

24

25

26

27

28

                              20

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____        12-29-14
JEREMY BRENDAN SEARS                      Date
Defendant

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am JEREMY BRENDAN SEARS's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          12/16/14
PAUL HORGAN, Esq.                         Date
Attorney for Defendant
JEREMY BRENDAN SEARS

22

## STATEMENT OF FACTUAL BASIS

From an unknown date and continuing until in or around November 2013, in Ventura County, and elsewhere, defendant repeatedly used computers, and interactive computer services connected through the Internet, to trick, extort, and persuade minors to produce sexually explicit images of themselves and send the images to defendant, and to transmit to defendant live visual depictions of the minors engaging in sexually explicit activity.  Defendant generally engaged in this activity from computers located at his home in Ventura County, California.  At all relevant times, defendant was over the age of 18 and targeted minors below the age of 18, as young as 12 years old.  Defendant frequently conducted these online activities using a proxy server, which masked defendant's actual Internet Protocol ("IP") address, in order to avoid detection by law enforcement.

As an initial step in his efforts to target minor victims, defendant would often create a fake social networking profile, using Internet services such as Facebook.com, MeetMe.com, and Tinychat.com. By choosing the photographs, biographical details, and statements on each fake profile, defendant constructed the fake profiles — under names such as "Louis Tompkins," "Rachel Lily," and "Sammi Summers" — in such a way as to make the victim believe that defendant's fake profile was a genuine profile that belonged to a teenager of roughly the same age (but the opposite sex) as defendant's intended victim. Defendant would then use the fake profile to befriend the victim, often convincing the victim that he or she was in a romantic online relationship with defendant's fake profile.  Once defendant established a purported romantic relationship between his intended

23

victim and the fake profile, defendant employed a variety of methods to cause the victim to produce and electronically send to defendant images of the victim engaging in sexually explicit conduct, or to cause the victim to conduct a live videochat with defendant in which the victim would engage in sexually explicit conduct, which defendant would record and keep on his computer.

Sometimes, to get some male minor victims to send defendant sexually explicit photographs or videos or to engage in sexually explicit conduct during a videochat, defendant, pretending to be a minor female, would send the male minor victim sexually-explicit photographs of what appeared to be a teenage girl that defendant stored on his computer and other data storage devices.

On other occasions, defendant would create yet another fake profile, in addition to the fake profile with whom the victim believed he or she was in a romantic relationship.  Then, taking advantage of the victim's youth and inexperience, defendant would pretend that the new fake profile — which employed names such as "Tommy Wiseau" — belonged to a person who intended to harm the victim's online boyfriend or girlfriend or the family of the boyfriend or girlfriend.  Defendant would use the new fake profile to convince the victim that the only way to prevent or heal the harm to the online boyfriend or girlfriend or the family of the boyfriend or girlfriend was for the victim to produce and send sexually explicit images, or for the victim to transmit a live visual depiction, through a webchat, of the victim engaging in sexually explicit conduct.

On two occasions, defendant, through his false online teenage girl persona, convinced a male minor victim to come to a secluded

park late at night to meet with the "girl."  Defendant met the victim in person and promised to take the victim to meet the "girl" if the victim undressed in front of defendant, an opportunity that defendant exploited by taking a video of the victim naked.

Other times, defendant did not use fake romantic relationships to target his victims, but rather used other forms of online harassment to extort sexually explicit images and transmissions from the minor victims.  Sometimes, defendant would acquire the victim's personal information, and then would harass the victim by posting that information (such as the victim's telephone number) on publicly accessible websites, in postings claiming that the victim had something to sell and wanted buyers to call him or her, or claiming that the victim wanted people to call him or her to arrange sexual relations.  While the victim was being harassed by calls from those who saw the postings, defendant would contact the victim offering to make the harassment stop if the victim would produce and send to defendant sexually explicit images or if the victim would transmit a live depiction of the victim engaging in sexually explicit conduct.

Other times, defendant, assisted by members of on-line groups known as the "Bieber Trolling and Hijacking Company" ("BTHC") or "The Confederacy," would harass his minor victims by posting obscene accusations about the victims' sexual activity, by repeatedly insulting the victims on their webpages, or by filling the victims' webpages with derogatory comments about people the victims liked.  Defendant would then offer to stop the harassment if his victims would send him sexually explicit images or would transmit to him live depictions of themselves engaging in sexually explicit conduct.

1   Other times, defendant would make physical threats against his

2   minor victims, threatening that the victims would be raped, tortured,

3   or killed if they did not give defendant a thing of value — namely,

4   nude and sexually explicit images of themselves.

5   When defendant received sexually explicit or nude images or

6   videos from his victims, he would frequently save those images or

7   videos on his computer and electronic storage devices, often

8   organized in separate folders for each victim.  When defendant

9   succeeded in convincing a victim to transmit a live visual depiction

10  of the victim engaging in sexually explicit conduct — for instance,

11  by convincing the victim to send defendant SEARS live video via the

12  Skype or Tinychat messaging systems — defendant would frequently save

13  portions of those transmissions for future use, using his computer to

14  create still screenshots or "screencaps" of moments from the

15  transmission, or using his computer to capture a partial video record

16  of the transmission.  Defendant would save the screenshots or video

17  records on his computer and electronic storage devices, often

18  organized in separate folders for each victim.

19  Knowing that the disclosure of these saved images or recorded

20  videos of his victims engaging in sexually explicit conduct could

21  cause great embarrassment to those portrayed, defendant would then

22  use the saved images or recorded videos to cause more harm to his

23  victims, in a variety of ways.  Sometimes, defendant (either through

24  his own persona, or using one of his fake online profiles) would

25  inform the victim that he had images of the victim engaging in

26  sexually explicit conduct, and would threaten to further distribute

27  those images if the victim did not create more such images, and did

28  not engage in further live transmissions of sexually explicit

26

conduct.  Other times, defendant (either through his own persona, or using one of his fake online profiles) would publicly distribute the saved images of the victim engaging in sexually explicit conduct, by posting those images to publicly accessible websites, including websites devoted to "revenge porn."  Sometimes, when defendant did this, his submission to the "revenge porn" websites would include his victim's actual name, school, phone number, email address, and location, together with derogatory comments about the victim —  information designed to humiliate the victim, and designed to make the victim vulnerable to further harassment from others seeing the information online.  On at least one occasion, defendant posted images of a victim's sexually explicit conduct onto the victim's own Facebook page, where the images were seen by the victim's friends and acquaintances.

On several occasions, defendant also distributed victims' sexually explicit images to defendant's cohorts and acquaintances in The Confederacy, by posting those images (often with derogatory comments) to Facebook groups that defendant controlled and to which The Confederacy's members had access.  Defendant would also frequently post to those groups records of his computer messaging conversations with the victims, showing the threats and insults he employed to convince the victims to create and send sexually explicit images and to transmit live depictions of sexually explicit conduct.

**A.   Victim C.G.**

In the fall of 2011, when male minor victim C.G. was 16 years old at all relevant times, he met someone professing to be a girl named "Beth" who used the login "bethykins," who was, in fact, defendant.  They traded nude images.  Defendant, as "Beth," sent

27

1    sexually explicit photos of what appeared to be a teenage girl to

2    C.G.  At defendant's direction, C.G. undressed and masturbated while

3    engaging in an online Skype live video webchat on October 25, 2011,

4    and October 29, 2011.  In the recorded webchat video of October 25,

5    2011, C.G. displayed his penis and masturbated on camera.  During the

6    recorded webchat video of October 29, 2011, defendant, as "Beth,"

7    claimed to have an "ex-boyfriend" who was a "Bloods" gang member.

8    Defendant, as "Beth," told C.G. that the "ex-boyfriend" would come to

9    C.G.'s home and kill him, but that "Beth" would stop him if C.G.

10   showed "Beth" his penis on the webcam, which C.G. then did.  At

11   defendant's direction, C.G. also masturbated on camera.  Defendant

12   recorded and saved all these video webchats on his computer and

13   digital devices.

14       **B.  Victim M.A.**

15       At all relevant times, male minor victim M.A. was 15 years old.

16   In late November 2011, defendant, posing as teenage girl "Beth

17   Johnson," with online name "bethykins," met M.A. online on

18   myyearbook.com (the predecessor website to meetme.com).  Defendant,

19   as "Beth," sent M.A. nude photos, purportedly of herself.  In a video

20   chat session extending from the evening of November 29 through the

21   early morning of November 30, 2011, M.A., at defendant's direction,

22   undressed, displayed his penis, masturbated to orgasm, and posed nude

23   in various positions on camera.  In a video chat session extending

24   from the evening of November 30 through December 1, 2011, defendant,

25   as "Beth," again directed M.A. to pose naked and masturbate on

26   camera.  In a video chat session in the early morning hours of

27   January 7, 2012, defendant, as "Beth," again directed M.A. to

28   undress, pose nude, and masturbate on camera.

1  Defendant recorded and saved all these video webchats on his

2  computer and digital devices.

3  **C.  Victim P.R.**

4  At all relevant times, male minor victim P.R. was 16 years old.

5  On January 2, 2012, P.R. went to visit a friend, who was engaged in a

6  video webchat with defendant, posing as "Beth" or "bethykins."  P.R.

7  joined the video webchat with defendant.  At defendant's direction,

8  P.R. undressed and displayed penis in front of the camera.  Defendant

9  complained that P.R. had not displayed his penis for long enough and

10  exhorted P.R. to show his penis again.  Defendant, as "Beth," then

11  threatened to have "Beth's ex-boyfriend" kill P.R. unless P.R.

12  displayed his penis on camera, telling P.R.'s friend during the

13  webchat that unless P.R. showed his penis again then he would be

14  "naked for [his] fucking autops[y]."  Defendant recorded and saved

15  all this video webchat on his computer and digital devices.

16  **D.  Victim A.A.**

17  At all relevant times, female minor victim A.A. was 16 years old

18  and resided in Australia.  In early November 2012, A.A., a fan of the

19  teen-pop band One Direction, had seen an online posting by defendant

20  mocking Amanda Todd, a Canadian teenager whose then-recent suicide

21  was drawing substantial press attention to the problem of revenge-

22  pornography — that is, the phenomenon of people publicly distributing

23  nude or obscene photographs of others in order to embarrass and shame

24  them.  Before her suicide, Amanda Todd posted a YouTube video telling

25  the story of how she was blackmailed into exposing her breasts on a

26  webcam, and how she was later bullied and attempted suicide when

27  someone circulated the pictures online.  A.A. posted online messages

28  criticizing Defendant for mocking Todd's suicide.  As a result,

defendant targeted A.A. to extort sexually explicit photographs of her.  Through Facebook, defendant sent messages to A.A. stating that he had purchased a plane ticket from the United States to Australia, that he would arrive on November 10, and that on his arrival he would rape and murder A.A. and torture her brother and cousin.  Defendant stated that the only way A.A. could prevent him from torturing, raping, and murdering her and the others was by taking nude photos of herself and sending them to him.  She first tried sending him other people's photos that she had found online, but defendant knew that they were fakes and got even angrier.  To underscore his capacity to harm A.A., defendant sent her pictures of her home and her brother, showing he knew how to find her and her loved ones.  For example, on November 3, 2012, defendant messaged A.A.: "I will kill you," and "After I have you to myself, all alone, I will tie you up . . . I will grab my knife and carve . . . into your back."  Defendant added: "Every time you are defiant to me, like you . . . refusing to follow my orders[,] I will cut off a part of your body."  Giving in to defendant's demands, A.A. sent defendant a frontal photograph of her naked body through Facebook messaging.  Defendant then posted A.A.'s nude photos to a public website, AnonIB.com, so that others could see them.

**E.   Victims J.H. and G.G.**

At all relevant times, female minor victim J.H. was 12 years old and residing in Ohio.  Her friend, female minor victim G.G., was also 12 years old and residing in Ohio.  In 2012, defendant, posing as "Louis Tomkins," met J.H. online through Facebook, and they struck up an online romantic relationship.  Defendant engaged in self-admitted cyber-bullying of J.H., which involved telling her to "just kill

yourself," and "If you're dead, the pain ends."  Defendant, as "Louis," also initiated an online romance with G.G., for the purpose of causing the two girls to fight each other over "Louis."  Defendant also sent harassing text messages, calls, and Facebook messages to G.G., threatening to come to her home.

In the days prior to December 9, 2012, defendant also assumed the false online persona of "Tommy Wiseau" and, as "Tommy," told J.H. that "Tommy" was going to hurt or kill "Louis" and his family members unless J.H. engaged in sexually explicit conduct on a video webchat with defendant.  As a result of these threats, J.H. posed nude and masturbated on camera during a video webchat that defendant recorded. On December 9, 2012, defendant posted photographs of screen stills from this video, as well as recorded excerpts of his chat sessions with J.H., on the Confederacy Facebook group and engaged other Confederacy members in online discussions about defendant's manipulation and harassment of J.H., making fun of how gullible she was.  Defendant accessed J.H.'s Facebook account and, posing as J.H., posted approximately four video screen still photos on J.H.'s personal Facebook page, and changed the account settings so that J.H. was locked out of her account and could not remove the posts.  These screen stills depicted J.H. touching her vagina and exposing her breasts and buttocks.  Defendant, posing as J.H., included titles such as: "UGH! Why do every1 hate me.  I just want some1 to love me." Defendant also hacked into J.H.'s email account, so that when J.H. attempted to reset her Facebook account settings to regain control of her Facebook page, on December 14, 2012, defendant again hijacked J.H.'s Facebook account and reposted the ten obscene screen stills, at times using a proxy server to mask defendant's actual IP address.

1  As a result of defendant's actions, J.H. was suspended from school,

2  became depressed, and started cutting herself.

3      **F.   Victim L.Z.**

4      At all relevant times, male minor victim L.Z. was 14 years old.

5  In 2013, defendant, upset that L.Z. had broken up with L.Z.'s

6  girlfriend, who was defendant's friend, posted L.Z.'s phone number on

7  Craigslist and on Facebook fan pages for the band One Direction.  As

8  a result, L.Z. received numerous harassing phone calls from people

9  who saw his phone number for over a year.  On or about July 3, 2013,

10 defendant, over Facebook messaging, threatened to continue spreading

11 his phone number on the Internet unless L.Z. sent nude photos of

12 himself and masturbated at defendant's command during video webchats.

13 To stop the harassment, L.Z. agreed.  On July 5 and July 8, 2013,

14 L.Z. engaged in video webchats that defendant recorded, in which L.Z.

15 posed nude, displayed his penis, and masturbated on camera.  During

16 one webchat, L.Z. said that the experience was "horrible."  Defendant

17 also demanded that L.Z. send particular sexually explicit photos,

18 such as ""2 full body pics, one from the front and one from the back,

19 close up of the dick and balls, close up of the ass."  On July 9,

20 2013, L.Z. sent five photos of his penis to defendant at the email

21 address "mrbigispleased922@gmail.com."  On July 10, 2013, L.Z. sent

22 defendant 20 photos of himself in various nude poses.  Defendant

23 ordered L.Z. to send more photos that were more focused on L.Z.'s

24 genitals.  As a result, later that same day, L.Z. sent defendant 7

25 close-up photos of L.Z.'s penis and buttocks at the same email

26 address.  On July 27, 2013, L.Z. sent defendant 27 nude photos,

27 including photos of his penis, with 19 photos sent to the same email

28 address, and 8 photos sent to defendant at "barrymanilow78@yahoo."

Defendant saved and kept all these photos on his computers and digital devices, including a Samsung laptop bearing serial number ZYVC93QB402617W, a Seagate external hard drive with serial number NA0KHSTJ, and an iOmega external hard drive.  Defendant possessed approximately 160 photos of L.Z. in various nude poses and many close-up shots of L.Z.'s penis, sometimes erect, sometimes being masturbated, as well as two sexually-explicit video recordings of defendant's video webchats with L.Z. described above.

Although Defendant was arrested by the Ventura County Sherriff's Department and criminally charged in state court in August 2013, Defendant's targeting of L.Z. did not end.  In November 2013, Defendant (using a pseudonym) contacted L.Z. on Facebook, saying "its Jeremy."  Defendant said that the "fbi raided my house interrogat[e]d me and took my stuff," but that he was "still going, just smuggling my bros wii for wifi."  In fact, defendant was using a Nintendo Wii gaming device to access the Internet to communicate with L.Z. Defendant said he needed to escape, and asked L.Z. to drive over and pick him up.  Defendant threatened that "I can get your nudes spread everywhere but would you even care enough to stop that?"  Later, defendant said that if L.Z. would not help him escape, then he wanted L.Z. to send "some pics" of "nudes."  Defendant asked for "30 a week until December ends," because "its been nearly 3 months of nothing so im pretty thirsty."  Defendant repeatedly asked for more nude pictures over the next few days, asking for them to be sent to the same email address he'd had L.Z. send pictures to in July.  On November 8, L.Z. emailed 10 nude photos to "mrbigispleased911@gmail.com," including close-up shots of L.Z.'s genitals, and defendant acknowledged that he had received them.

These emails have been recovered from the victim's email account. Defendant's November contacts with L.Z. were in violation of two release conditions in Defendant's state-court case — a condition that he have no contact with minors, and a condition that he not use the Internet.  Between November 9 and 20, 2013, defendant repeatedly sent Facebook messages to L.Z. requesting more photographs.

**G.  Victim J.B.**

At all relevant times, male minor victim J.B. was 15 years old. In June of 2013, defendant, posing online as a teenage girl named "Rachel Lily" on the website meetme.com — the same website where defendant met male minor victim M.N. — met and began an online relationship with victim J.B.  At defendant's direction, on or about July 6, 2013, J.B. took and sent "Rachel" approximately 24 sexually explicit digital photos through an online website called Kik.  These photographs included close-ups of J.B.'s erect penis, photos of J.B. masturbating, and full-body photos of J.B. in the shower, all of which defendant received and saved on defendant's computers and digital devices, including a Seagate external hard drive bearing serial number NA5KRCF.  On or about July 7, 2013, defendant posted at least 20 of these photographs on various public Internet websites, including AnonID.com, along with J.B.'s name, phone number, and online username, and the caption: "I was into this boy . . . and he was taking advantage of me now im mad so here his dox and nudes," causing random people to contact and harass J.B.

Eventually defendant, as "Rachel," convinced J.B. to meet at night at a park in Moorpark, California, similar to defendant's meeting with victim M.N.  When J.B. arrived at Mountain Meadows Park, defendant, as "Rachel," sent J.B. a text message saying "Rachel" had

sent her "brother."  Defendant then greeted J.B. in person,
identified himself as "Rachel's brother," and asked to search J.B.
J.B. refused and left the park.  "Rachel" again convinced J.B. to
meet at a nearby park.  Defendant, again posing as "Rachel's
brother," met with J.B. and convinced J.B. to undress partially.
When defendant demanded that J.B. undress fully, J.B. refused and
left.  J.B. attempted to block further attempts by "Rachel" or
"Rachel's brother" to contact him online.  However, defendant, as
"Rachel," managed to contact J.B. online and threatened to post
J.B.'s nude photos and personal information online.  J.B. therefore
gave in and agreed to meet at Peach Hill Park.  Again, defendant
greeted J.B. and attempted to convince J.B. to allow defendant to
take nude photographs of J.B. to stop "Rachel's" threats.

**H.   Victim A.H.**

At all relevant times, female minor victim A.H. was 15 years
old.  In August 2013, defendant took control of and locked A.H. out
of the Facebook fan-page that A.H. had made for the band One
Direction.  On or about August 1, 2013, defendant sent a Facebook
message to A.H. demanding that she send him nude photos in order to
regain control of her page.  If she didn't, defendant threatened to
post nude photos of other girls on the fan-page to make others
believe she was responsible for the posts.  Although she tried to
appease him by sending photos of just her naked breasts, he insisted
that she send pictures showing both her breasts and face, so that she
could be identified from the pictures.  A.H. complied.  Once
defendant received photos showing A.H.'s face and breasts, he
threatened to post them publicly if she didn't send more explicit
photographs.  A.H. gave in and sent more photographs, including full

35

frontal nudes that lasciviously displayed her pubic area.  Each time A.H. sent defendant a photograph, defendant would demand more. Altogether, defendant received approximately 12 sexually explicit photographs of A.H., which he saved on his computers and digital devices.

### I.   Victim M.N.

At all relevant times, male minor victim M.N. was 17 years old. In the summer of 2013, defendant, posing online as a teenage girl named "Rachel Lily," met victim M.N. on the website meetme.com, the same website where defendant met victim J.B.  Defendant, as "Rachel," encouraged M.N. to take sexually explicit photos of himself and send them to "Rachel" at defendant's account.  On August 12, 2013, defendant, as "Rachel," convinced M.N. to come to Mountain Meadow Park in Moorpark around 1:30 a.m. that night to meet "Rachel."  At the park, defendant greeted M.N. and claimed to be Rachel's "brother," as he did with victim J.B.  Defendant said he would take M.N. to meet with "Rachel" only if M.N. first undressed for defendant.  M.N. complied and undressed.  At defendant's direction, M.N. exposed his genitals and turned around for defendant's inspection.  Defendant, who refused to give back M.N.'s clothes, walked with M.N. to Peach Hill Park to see "Rachel."  During the walk there, defendant periodically used his own body to shield M.N., who was still naked, from passing drivers on the road.  At Peach Hill Park, defendant then told M.N. that "Rachel" now wanted to meet back at Mountain Meadow Park.  After they returned to Mountain Meadow Park, M.N. waited for a half-hour before defendant said that "Rachel" was not coming.  Defendant gave back M.N.'s keys but not his clothes or wallet, forcing M.N. to drive home naked.  Later that day, M.N.

1  sent a message to defendant via the Skype message system asking for
2  his clothes and wallet.  Defendant responded with a message that
3  "Rachel" had been kidnapped.  Defendant, as "Rachel," then sent M.N.
4  a message via meetme.com saying "Rachel" had been kidnapped, was
5  being held in a hotel with her legs broken, and was being sent to
6  Thailand to work as a prostitute.

7      The next day, on August 13, 2013, defendant, posing online as a
8  teenage girl named "Sammi Summer," sent a Facebook message to M.N.
9  offering to exchange nude photographs.  M.N. agreed and sent
10 defendant four photographs one at a time, each one in response to
11 defendant's commands like "take em off," "no underwear this time,"
12 "how about a full body nude" and "how about the other side,"
13 including a close-up of M.N.'s penis.  Defendant received and saved
14 these photographs to his computers and digital devices, including a
15 Seagate external hard drive bearing serial number NA5KRCF, and a
16 Samsung laptop bearing serial number ZYVC93QB402617W.  Defendant, as
17 "Sammi," asked M.N. to meet the night of August 14 at Sycamore Park
18 in Simi Valley.  M.N. contacted defendant, who told M.N. to meet at
19 Moorpark High School to get his wallet back.  Defendant also claimed
20 that "Sammi" was defendant's ex-girlfriend.  Defendant, as "Sammi,"
21 told M.N. that he should get naked for defendant, who was "crazy," to
22 "get him to leave us alone," and that defendant was apparently
23 "threatening to tell secrets about me if you dont."  M.N. told
24 "Sammi" he would meet with defendant.  Defendant, as "Sammi," thanked
25 M.N. for "making my life a lot better by doing all this i owe you
26 big."

27     On the night of August 14, 2013, around 9:00 p.m., defendant met
28 M.N. at a bathroom in Moorpark High School and offered to return

M.N.'s wallet if M.N. undressed for one minute.  As M.N. complied, defendant directed M.N. to turn to show different views, then insisted on extending the time and attempted to grab M.N.'s penis. Unbeknownst to M.N., defendant secretly used his cell phone to make a video recording of M.N. posing naked.  M.N. refused to continue posing, got dressed, and left Moorpark High School to meet "Sammi." Defendant sent M.N. a text message saying that M.N. had not fulfilled his end of the deal and ordered M.N. to return to the school.  When M.N. refused, defendant texted that "Sammi" would disappear to Thailand like "Rachel" unless M.N. met with defendant for 15 minutes in which defendant would be allowed to do anything but "fuck" M.N., that "touching is included and so is everything else," and "sucking will be necessary now," referring to oral sex.  Defendant also threatened to distribute M.N.'s naked photos online: "If you thought me seeing you naked was bad, the whole world seeing you naked will be a lot worse . . . If you don't answer in 10 minutes I'm uploading your chats with Sammi, including the pictures."

**J.   Victim Y.K.**

At all relevant times, female minor victim Y.K. resided in Canada and was approximately 14 or 15 years old.  In late 2012, defendant, posing as a teenage boy named "Alex," began an online romance with Y.K.  Later, defendant sent messages to Y.K. threatening to hurt or kill "Alex."  In these messages, defendant called Y.K. a "whore" and claimed that "Alex should be bleeding to death now." Ultimately, defendant convinced Y.K. to undress during a video webchat, which defendant recorded and saved on his computer.  The recorded images include images of Y.K's naked breasts and buttocks.

**K.   Victim N.L.**

At all relevant times, female minor victim N.L. was 14 years old and resided in Northern California.  Defendant met N.L. online.  Though N.L. protested that sending defendant lewd photographs was "against the law given that I am only 14," defendant ultimately convinced N.L. to send him several nude photographs, including a close-up vagina photograph.  Defendant then used a proxy server to post some of the photographs to various websites, along with N.L.'s name and contact information.

**L.   Victim N.K.**

At all relevant times, male minor victim N.K. was 17 years old.  In the summer of 2013, defendant, posing online as "Rachel," met and began an online romance with N.K.  Defendant, as "Rachel," claimed to have run away from home to avoid being beaten by "Rachel's" mother, then became a prostitute and "was forced to do a lot of bad things to survive."  Defendant convinced N.K. to send him several photographs of N.K.'s penis, some depicting N.K. masturbating his penis.  Defendant saved those photographs to his computers and digital devices.